**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| REV. DAVID LEWICKI | ) | |
| | ) | |
| VLADIMIR SHKLOVSKY, | ) | |
| | ) | |
| Plaintiffs, | ) | Civ. No. 24-2505 (ABJ) |
| | ) | |
| v. | ) | |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | MEMORANDUM IN SUPPORT OF |
| | ) | PARTIAL MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FEDERAL ELECTION COMMISSION'S MEMORANDUM OF POINTS AND**
**AUTHORITIES IN SUPPORT OF ITS PARTIAL MOTION FOR SUMMARY**
**JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMARY**
**JUDGMENT**

Lisa J. Stevenson (D.C. Bar No. 457628)        Shaina Ward (D.C. Bar No. 1002801)
Deputy General Counsel – Law                         Attorney
lstevenson@fec.gov                                          sward@fec.gov

James D. McGinley (D.C. Bar No. 1017536)    /s/ *Sophia H. Golvach*
Associate General Counsel                              Sophia H. Golvach (D.C. Bar. No. 1656365)
jmcginley@fec.gov                                          Attorney
                                                                     sgolvach@fec.gov

June 22, 2026                                                COUNSEL FOR DEFENDANT
                                                                     FEDERAL ELECTION COMMISSION
                                                                     1050 First Street, NE
                                                                     Washington, DC 20463
                                                                     (202) 694-1650

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................1

BACKGROUND ...........................................................................................................3

I.    STATUTORY AND LEGAL BACKGROUND.............................................................3

    A.    The FEC and its Administrative Enforcement Procedures ...............................3

    B.    Contributions in the Name of Another..................................................6

    C.    *End Citizens United* and the Commission's Case Closure Procedures..............7

II.   FACTUAL BACKGROUND.....................................................................................9

    A.    The FEC's Consideration of the Administrative Complaint............................9

    B.    The Statement of Reasons.................................................................11

ARGUMENT .............................................................................................................14

I.    LEGAL STANDARDS .........................................................................................14

    A.    Summary Judgment Standard ...........................................................14

    B.    Legal Standard Under 52 U.S.C. § 30109(a)(8) .............................................15

II.   SUMMARY JUDGMENT SHOULD BE GRANTED TO THE COMMISSION ON COUNT ONE BECAUSE THE CONTROLLING COMMISSIONERS' EXPLANATION OF THE DISMISSAL OF PLAINTIFFS' ADMINISTRATIVE COMPLAINT WAS CONTEMPORANEOUS .........................................................16

    A.    The Commission Issued a Contemporaneous Statement of Reasons ..............17

        1.    The Statement of Reasons Issued When the Reason to Believe Vote Resulted in an Order of Dismissal.......................................................17

        2.    The Explanation for the Reason to Believe Vote Is The Proper Subject for Judicial Review.............................................................19

        3.    The Time Between the Vote to Close and the Statement of Reasons is Reasonable................................................................................20

            1.    The Statement of Reasons Allows Meaningful Judicial Review of the Commissioners' Decision to Close the File......................21

i

2.   The Timing of the Statement of Reasons Contributed to Reasoned Decision Making by the Agency.................................................24

3.   The Statement of Reasons Enhances Predictability for Future Litigants ...................................................................................27

B.      The Commission's Treatment of the Complaint Complied with *ECU*............27

III.    SUMMARY JUDGMENT SHOULD BE GRANTED TO THE COMMISSION ON COUNT THREE BECAUSE THE CONTROLLING COMMISSIONERS' INTERPRETATION OF FECA'S CONDUIT STANDARD WAS NOT CONTRARY TO LAW ................................................................................................32

A.      The Controlling Commissioners Did Not Impose a Rule Limiting the Bar on Conduit Contributions to When the True Contributor Advances Money to a Conduit that Immediately Makes a Contribution.............................................33

B.      The Controlling Commissioners Did Not Impose a Rule Requiring Total "Control" Over an Intermediary in a Conduit Scheme ...................................36

CONCLUSION...............................................................................................................39

**TABLE OF AUTHORITIES**

**PAGE(S)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ..................................................................................................14-15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................... 15

*Bennett v. Spear*,
520 U.S. 154 (1997) ................................................................................................. 16, 18

*Buckley v. Valeo*,
424 U.S. 1 (1976) ........................................................................................................... 3

*Campaign Legal Ctr. v. FEC*,
No. 1:19-cv-02336, 2025 WL 315143 (D.D.C. Jan. 28, 2025) .............................. 29, 30, 31, 32

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ................................................................................................. 14, 15

*CLC v. 45Committee, Inc.*,
118 F.4th 378 (D.C. Cir. 2024)...................................................................................... 28

*CLC & Democracy 21 v. FEC*,
952 F.3d 352 (D.C. Cir. 2020)......................................................................................... 7

*Common Cause v. FEC*,
842 F.2d 436 (D.C. Cir. 1988)...............................................................................*Passim*

*CREW v. FEC*,
209 F. Supp. 3d 77 (D.D.C. 2016)................................................................................. 15

*CREW v. FEC*,
316 F.Supp.3d 349 (D.D.C. 2018).................................................................................. 15

*CREW v. FEC*,
892 F.3d 434 (D.C. Cir. 2018) ................................................................................... 8, 19

*CREW v. FEC*,
380 F. Supp. 3d 30 (D.D.C. 2019)................................................................................. 24

*CREW v. FEC*,
No. 22-CV-3281, 2023 WL 6141887 (D.D.C. Sept. 20, 2023)............................... 18, 21

*Democratic Cong. Campaign Comm. v. FEC*,
831 F.2d 1131 (D.C. Cir. 1987)............................................................................ 19

*Diamond v. Atwood*,
43 F.3d 1538 (D.C. Cir. 1995)............................................................................... 14

*End Citizens United PAC v. FEC*,
69 F.4th 916 (D.C. Cir. 2023)........................................................................*Passim*

*End Citizens United PAC v. FEC*,
No. 1:21-cv-01665, 2022 WL 1136062 (D.D.C. Apr. 18, 2022) ................................ 8

*FEC v. Democratic Senatorial Campaign Comm.*,
454 U.S. 27 (1981) ............................................................................................... 15

*FEC v. Nat'l Conservative Political Action Comm.*,
470 U.S. 480 (1985) ............................................................................................... 6

*FEC v. Nat'l Republican Senatorial Comm.*,
966 F.2d 1471 (D.C. Cir. 1992)............................................................... 5, 11, 15, 16

*FEC v. Rose*,
806 F.2d 1081 (D.C. Cir. 1986)............................................................................. 23

*FEC v. Swallow*,
304 F. Supp. 3d 1113 (D. Utah 2018) ..................................................................... 7

*Free Speech for People v. FEC*,
No. cv 22-666, 2024 WL 3617481 (D.D.C. Aug. 1, 2024)....................................... 20

*Humane Soc'y of the United States v. USDA*,
41 F.4th 564 (D.C. Cir. 2022)............................................................................... 26

*In re Carter-Mondale Reelection Comm.*,
642 F.2d 538 (D.C. Cir. 1980)............................................................................... 15

*In re Sealed Case*,
223 F.3d 775 (D.C. Cir. 2000)............................................................................... 16

*Latif v. Obama*,
666 F.3d 746 (D.C. Cir. 2011)............................................................................... 24

*League of United Latin Am. Citizens v. Exec. Off. of the President*,
780 F. Supp. 3d 135 (D.D.C. 2025)........................................................................ 23

*Loper Bright Enter. v. Raimondo*,
  603 U.S. 369 (2024) ....................................................................................... 16

*Michigan v. EPA*,
  576 U.S. 743 (2015) ....................................................................................... 17

*Nader v. FEC*,
  823 F. Supp. 2d 53 (D.D.C. 2011)................................................................... 20

*NRDC v. Wheeler*,
  955 F.3d 68 (D.C. Cir. 2020)........................................................................... 26

*Orloski v. FEC*,
  795 F.2d 156 (D.C. Cir. 1986)................................................................... 15, 16

*Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*,
  400 U.S. 62 (1970) .......................................................................................... 18

*Pub. Citizen, Inc. v. FERC*,
  839 F.3d 1165 (D.C. Cir. 2016)....................................................................... 24

*DHS v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ....................................................................................*Passim*

*Train v. Nat. Res. Def. Council*,
  421 U.S. 60 (1975) .......................................................................................... 15

*United States v. Boender*,
  649 F.3d 650 (7th Cir. 2011) ..................................................................... 12, 34

*United States v. O'Donnell*,
  608 F.3d 546 (9th Cir. 2010) ..................................................... 7, 12, 34, 37

*United States v. Whittemore*,
  776 F.3d 1074 (9th Cir. 2015) ................................................................... 12, 34

*Wildlife v. Dep't of Agric.*,
  311 F. Supp. 2d. 44 (D.D.C. 2004)............................................................ 14, 15

*Zenith Radio Corp. v. United States*,
  437 U.S. 443 (1978) ........................................................................................ 15

**Statutes and Regulations**

5 U.S.C. § 551(4) ............................................................................................... 26

52 U.S.C. § 30106(e) ....................................................................................................... 3

52 U.S.C. § 30109(a)(12)............................................................................................... 3

52 U.S.C. § 30101 ............................................................................................................ 3

52 U.S.C. § 30103 ...................................................................................................... 10, 11

52 U.S.C. § 30104 ...................................................................................................... 10, 11

52 U.S.C. § 30106(b)(1) ................................................................................................. 3

52 U.S.C. § 30101(8)(A) ............................................................................................... 6

52 U.S.C. § 30106(c) .............................................................................................. 4, 23

52 U.S.C. § 30107 ................................................................................................... 4, 23

52 U.S.C. § 30109 .................................................................................................... 3, 20

52 U.S.C. § 30109(a)(1) ........................................................................................... 3, 24

52 U.S.C. § 30109(a)(2) ..................................................................................... 3, 4, 5, 25

52 U.S.C. § 30109(a)(3) ................................................................................................ 5

52 U.S.C. § 30109(a)(4)(A)(i) ...................................................................................... 5

52 U.S.C. § 30109(a)(8) ......................................................................................*Passim*

52 U.S.C. § 30109(a)(8)(A) ..................................................................................... 6, 18

52 U.S.C. § 30109(a)(8)(B) ..................................................................................... 6, 22

52 U.S.C. § 30109(a)(8)(C) ................................................................................ 6, 15, 16

52 U.S.C. § 30109(a)(B) ............................................................................................ 19

52 U.S.C. § 30116(a)(8) ..................................................................................... 7, 37, 38

52 U.S.C. § 30122.................................................................................................*Passim*

52 U.S.C. § 30145(a) ................................................................................................... 21

52 U.S.C. § 30107(a)(7)................................................................................................. 3

vi

52 U.S.C. § 30107(a)(8) ............................................................................................................... 3

11 C.F.R. § 111.20 ...................................................................................................................... 3

11 C.F.R. § 111.21 ...................................................................................................................... 3

11 C.F.R. § 102.1(d) .............................................................................................................. 10, 11

11 C.F.R. § 104.1 ................................................................................................................... 10, 11

11 C.F.R. § 104.2 ................................................................................................................... 10, 11

11 C.F.R. § 104.3 ................................................................................................................... 10, 11

11 C.F.R. § 104.8 ................................................................................................................... 10, 11

11 C.F.R. § 2.2(d)(1) ................................................................................................................ 4, 25

11 C.F.R. § 2.4 ......................................................................................................................... 4, 25

11 C.F.R. § 110.4(b) .............................................................................................................. *Passim*

11 C.F.R. § 110.4(b)(2) ..................................................................................................... 12, 33, 34

11 C.F.R. § 110.4(b)(2)(ii) ............................................................................................................ 6

11 C.F.R. § 110.6(c)(1)(iv)(B) .................................................................................................... 38

11 C.F.R. § 110.6(d)(1) ................................................................................................................ 38

11 C.F.R. § 110.6(d)(2) ................................................................................................................ 38

11 C.F.R. § 111.16 ........................................................................................................................ 5

11 C.F.R. § 111.9(b) ................................................................................................................... 28

11 C.F.R. § 111.20(a) ................................................................................................................. 28

**Rules**

Fed. R. Civ. P. 56(c)……………………………………………………………………………..14

**Other Authorities**

*Affiliated Committees, Transfers, Prohibited Contributions, Annual Contribution Limitations and
    Earmarked Contributions*,
    54 Fed. Reg. 34098 (Aug. 17, 1989) ...................................................................... 37

*Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the
    Enforcement Process*,
    89 Fed. Reg. 19,729 (Mar. 20, 2024) ...................................................................... 5

Certification, MUR 8122 (Lafazan for Congress), Feb. 6, 2024,
https://www.fec.gov/files/legal/murs/8122/8122_13.pdf.......................................................22, 23

Federal Election Commission, *Commission meetings—Executive sessions*,
https://www.fec.gov/meetings/?tab=executive-sessions…………………………………………...23

Federal Election Commission, *FEC implements new enforcement case closure procedures* (Apr.
3, 2024), https://www.fec.gov/updates/fec-implements-new-enforcement-case-closure-
procedures/…………………………….........................................……………….…….…*Passim*

Statement of Reasons of Vice Chairman Cooksey and Commissioners Dickerson and Trainor,
MUR 7464 ("LZP"), July 7, 2023,
https://www.fec.gov/files/legal/murs/7464/7464_90.pdf.............................................................12

Statement of Reasons of Chairman Cooksey and Comm'rs Dickerson and Trainor, MUR 8082
("Unknown Respondents"), Apr. 8, 2024,
https://www.fec.gov/files/legal/murs/8082/8082_70.pdf.............................................................13

**INTRODUCTION**

In this action, plaintiffs Rev. Devid Lewicki and Vladimir Shklovsky challenge as contrary to law the dismissal of their administrative complaint by the Federal Election Commission ( "FEC" or "Commission"), in which plaintiffs alleged a labyrinthine conduit contribution scheme in violation of the Federal Election Campaign Act ("FECA").  In Counts I and III of their judicial complaint, plaintiffs claim, respectively, that the explanation for the dismissal vote was untimely and that Commissioners imposed heightened strictures on the bar on conduit contributions.  Because the undisputed material facts show that the Commission did not act contrary to law, the Commission should be granted summary judgment on these counts, and plaintiffs' partial summary-judgment motion should be denied.

Plaintiffs allege that, in the run-up to the 2020 election in Georgia for senator, an unknown contributor or contributors channeled five million dollars through a series of three tax-exempt 501(c)(4) nonprofits to three super PACs.  Because these entities, and the people associated with them, allegedly knowingly made, permitted to be made, and accepted contributions in the name of another, and failed to report such contributions, plaintiffs contended that they violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b).  Pursuant to its normal administrative procedures, the Commission deliberated on plaintiffs' administrative complaint at an executive session on June 25, 2024, and split 3-3 on whether to find reason to believe that FECA had been violated and to launch an administrative investigation.  Eight days later, Commissioners voted unanimously to close the file on the administrative complaint effective thirty days after the vote, pursuant to the Commission's case closure procedures.  On July 29, 2024, the Commissioners that voted not to find reason to believe released their Statement of Reasons, which explained the split reason to believe vote and resultant dismissal.

In Count I of this action, plaintiffs allege that the Commission acted untimely because the Statement of Reasons came too late after the vote to dismiss.  Specifically, plaintiffs argue that the statement is an impermissible *post-hoc* rationalization that cannot support a dismissal and that, because there was no contemporaneous statement explaining the dismissal, the Commission acted contrary to law.  Plaintiffs rely on *End Citizens United PAC v.* FEC, 69 F.4th 916 (D.C. Cir. 2023) ("*ECU*"), in which the D.C. Circuit found that a statement of reasons was insufficiently contemporaneous when filed two months after the vote to dismiss the administrative complaint and four days after the complainant filed suit.

In Count III, plaintiffs claim that—even if the Court were to accept the Statement of Reasons as contemporaneous—the Commission still acted contrary to law because Commissioners prescribed two additional limits on the ban on conduit contributions. Specifically, plaintiffs contend that the Statement of Reasons imposed requirements that:  (1) the true contributor's transfer to the conduit immediately predates the transfer from the conduit to the eventual recipient; and (2) the conduit be controlled by the true contributor.

Plaintiffs' arguments fail.  With respect to Count I, the Statement of Reasons was released nearly simultaneously with the closure of the file.  Moreover, even if the Court considered the date Commissioners voted to close the file, rather than the dismissal itself, the time that elapsed between the vote and the issuance of the Statement was reasonable and was consistent with the *ECU* decision, as demonstrated by two previous decisions in comparable circumstances.  With respect to Count III, plaintiffs' arguments miss the mark for a more fundamental reason:  the Statement of Reasons, properly read, does not enunciate any new legal standards at all.  The alleged new requirement that conduit contributions be advanced to the conduit immediately prior to the conduit's transfer is drawn from a restrictive reading of the

Statement of Reasons that the Court should reject.  Additionally, the Commissioners' discussion

of the "control" required in conduit contributions is no different than that which the plaintiffs

themselves put forth.

Because the Commission did not act contrary to law, the Court should grant summary

judgment in favor of the Commission on Counts I and III, and plaintiffs' motion should be

denied.

**BACKGROUND**

**I.    STATUTORY AND LEGAL BACKGROUND**

**A.  The FEC and its Administrative Enforcement Procedures**

The FEC is an independent agency of the United States government with jurisdiction

over the administration, interpretation, and civil enforcement of FECA, 52 U.S.C. §§ 30101-46.

*See generally id.* §§ 30106(b)(1), 30107(a), 30109.  Congress provided for the Commission to

"prepare written rules for the conduct of its activities," *id.* § 30106(e), "formulate policy" under

FECA, *see, e.g., id.* § 30106(b)(1), and make rules and issue advisory opinions,

*id.* §§ 30107(a)(7), (8); *id.* §§ 30108; 30111(a)(8); *see also Buckley v. Valeo*, 424 U.S. 1, 110-11

(1976) (per curiam).  The Commission is also authorized to institute investigations of possible

violations of FECA, 52 U.S.C. § 30109(a)(1)-(2), and to initiate civil enforcement actions in the

United States district courts, *id.* §§ 30106(b)(1), 30107(a)(6), 30107(e), 30109(a)(6).

FECA permits any person to file an administrative complaint with the Commission

alleging a violation of the statute.  *Id.* § 30109(a)(1).  Absent waiver, proceedings on such

complaints are covered by confidentiality protections, *id.* § 30109(a)(12), 11 C.F.R. § 111.21,

until the Commission "terminates its proceedings," 11 C.F.R. § 111.20.  Upon receipt of an

administrative complaint, the Commission's Office of General Counsel ("OGC") is required to

3

notify anyone alleged to have committed such a violation, referred to as a respondent, and to provide such persons with an opportunity to demonstrate in writing that no action should be taken. *Id*. OGC then prepares a report to the Commission known as a General Counsel's Report. The Report analyzes the allegations in the complaint, applies the relevant law to the facts alleged, and sets forth OGC's recommendations for Commission action. The First General Counsel's Report ("FGCR") in an enforcement MUR usually includes a recommendation that the Commission take actions, or take no action, regarding the alleged violations.

Generally, if one or more Commissioners object to an FGCR after it has been circulated to the Commission, or if fewer than four Commissioners vote to approve or reject the report's recommendations by the voting deadline, the Commission considers the enforcement matter at an executive session. Executive sessions are meetings that are closed to the public during which Commissioners consider pending enforcement matters and other items that must be kept confidential. *See* 11 C.F.R. § 2.4. A "meeting," according to FEC regulations, is "the deliberation of at least four voting members of the Commission in collegia where such deliberations determine or result in the joint conduct or disposition of official Commission business." *Id.* § 2.2(d)(1). During executive sessions, the Commissioners may, *inter alia*, discuss OGC's recommendations and vote on potential actions like those described above, including whether there is "reason to believe" that a FECA violation has occurred. 52 U.S.C. § 30109(a)(2). Commissioners also may consider proposed rulemakings, audits, litigation, personnel issues, and agency policy. *See, e.g.*, *id.* § 30107 (setting forth the powers of the Commission that may only be exercised upon a vote of four or more Commissioners, as required by 52 U.S.C. § 30106(c)). Generally speaking, at the initial stage in the enforcement process, the Commission will take one of the following actions with respect to a MUR at an

4

executive session:  (1) find ''reason to believe''; or (2) dismiss.  *See* Federal Election Commission, *Statement of Policy Regarding Commission Action in Matters at the Initial Stage in the Enforcement Process*, 89 Fed. Reg. 19,729 (Mar. 20, 2024).

If at least four members of the Commission vote to find "reason to believe" a FECA violation has occurred, the Commission must notify the respondent of the alleged violation and its factual basis, and the agency then ordinarily investigates the allegations. 52 U.S.C. § 30109(a)(2).  If the Commissioners determine there is "reason to believe" a FECA violation has occurred and the matter is investigated, OGC may recommend that the Commission find that there is "probable cause" to believe FECA has been violated.  *Id.*  § 30109(a)(3). Respondents are entitled to file a responsive brief, *id*., and OGC prepares a report to the Commission with further recommendations, 11 C.F.R. § 111.16.  If at least four members of the Commission vote to find probable cause to believe that a violation has occurred, the Commission must first attempt to resolve the matter by "informal methods of conference, conciliation, and persuasion, and to enter into a conciliation agreement" with the respondents. 52 U.S.C. § 30109(a)(4)(A)(i).  If informal methods of conciliation fail, the Commission may, "upon an affirmative vote of 4 of its members," file a *de novo* civil enforcement suit in federal district court.  *Id.* § 30109(a)(6)(A).

If at least four members do not vote to find "reason to believe," no investigation or conciliation ensues, and the matter may be closed.  In cases where the Commissioners divided evenly as to whether to proceed, the Commissioners who voted against taking further action "must provide a statement of their reasons" in order "to make judicial review a meaningful exercise."  *FEC v. Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992). "Since those Commissioners constitute a controlling group for purposes of the decision, their

rationale necessarily states the agency's reasons for acting as it did." *Id.* Per

52 U.S.C. § 30109(a)(8)(B), aggrieved parties have 60 days from the day their complaint is

dismissed to seek judicial review of the dismissal.

FECA provides that the administrative complainant may seek judicial review in this

District pursuant to 52 U.S.C. § 30109(a)(8)(A) if the Commission dismisses or is alleged to

have failed to act on a complaint. If a court in a review action declares that a Commission

dismissal or failure to act is "contrary to law," the court can order the Commission to conform to

that declaration within 30 days. *Id.* § 30109(a)(8)(C). If the Commission fails to conform to the

declaration within 30 days, the complainant may obtain a private right of action against the

administrative respondent for the alleged violations. *Id.*; *FEC v. Nat'l Conservative Political

Action Comm.*, 470 U.S. 480, 488 (1985).

### B. Contributions in the Name of Another

FECA places certain limitations on political contributions, which are defined as "any gift,

subscription, loan, advance, or deposit of money or anything of value made by any person for the

purpose of influencing any election for Federal office." 52 U.S.C. § 30101(8)(A). In line with

its statutory policies, FECA provides that "[n]o person shall make a contribution in the name of

another person or knowingly permit his name to be used to effect such a contribution, and no

person shall knowingly accept a contribution made by one person in the name of another

person." *Id.* § 30122. The implementing regulation, 11 C.F.R. § 110.4(b), provides examples of

prohibited contributions, including, *e.g.*, "false name" contributions, in which a contributor

directly gives "money or anything of value and attribute[es] as the source of the money or thing

of value another person when in fact the contributor is the source." *Id.* § 110.4(b)(2)(ii). FECA

also prohibits "straw donor" contributions, which are "*indirect* contribution[s]" from a

6

contributor using an intermediary or conduit. *See United States v. O'Donnell*, 608 F.3d 546, 549 (9th Cir. 2010); *FEC v. Swallow*, 304 F. Supp. 3d 1113, 1115 (D. Utah 2018) (explaining that "[a] false name contribution occurs when a person contributes to a candidate but falsely attributes another person as the source of the contribution" and "[an illegal] conduit contribution reaches the same result when a person provides funds to another person (the conduit) who contributes the funds to the candidate"); *CLC & Democracy 21 v. FEC*, 952 F.3d 352, 354 (D.C. Cir. 2020) (stating that 52 U.S.C. § 30122 is "designed to ensure accurate disclosure of contributor information").

With respect to conduit contributions, FECA states that "all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate" are "treated as contributions from such person to such candidate." 52 U.S.C. § 30116(a)(8). FECA requires any such "intermediary or conduit" to "report the original source and the intended recipient of such contribution to the Commission and to the intended recipient." *See id.*

### C. *End Citizens United* and the Commission's Case Closure Procedures

In 2023, the D.C. Circuit Court of Appeals considered the contemporaneity requirement for explanations in the FEC's enforcement process. *See generally ECU.* There, the plaintiff End Citizens United PAC sued the Commission two months after Commissioners voted to close the file on its administrative complaint, arguing that the FEC acted contrary to law when it failed to find reason to believe that FECA had been violated and failed to explain its reasoning for dismissal. *See id.* at 919. Four days after the plaintiff filed suit, the controlling Commissioners released their statement of reasons. *Id.* The district court denied the plaintiff's motion for a

7

default judgment, concluding that it could not "second guess" the controlling Commissioners' statement, even though the statement was "belated." *Id.* (quoting *End Citizens United PAC v. FEC*, No. 1:21-cv-01665, 2022 WL 1136062, at *2 (D.D.C. Apr. 18, 2022)).

The Circuit Court reversed. *See generally id.* Following well-worn case law, the Circuit Court concluded that the "controlling Commissioners' explanation [must] be issued 'at the time when a deadlock vote results in an order of dismissal.'" *Id.* at 921 (quoting *Common Cause v. FEC*, 842 F.2d 436, 449 (D.C. Cir. 1988)). It explained that a statement of reasons "issued after the commencement of the underlying litigation and the expiration of the statutory deadline to challenge the dismissal, 52 U.S.C. § 30109(a)(8)," was impermissible *post-hoc* reasoning. *Id.* The Court instructed the agency that it "cannot *sua sponte* update the administrative record when an action is pending in court." *Id.* (quoting *CREW v. FEC*, 892 F.3d 434, 438 n.5 (D.C. Cir. 2018)). The Court further highlighted "important values of administrative law," including "promot[ing] 'agency accountability' by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority," noting that "[i]t hardly 'instills confidence that the reasons given are not simply convenient litigating positions' for the Commission to withhold the basis of its decision unless and until a lawsuit is filed[.]" *Id.* at 923 (quoting *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 23 (2020)).

On April 3, 2024, the Commission announced it was adopting new procedures for the closure of administrative enforcement matters "intended to bring the Commission into compliance with the 2023 decision of the U.S. Court of Appeals for the District of Columbia Circuit in *End Citizens United v. FEC* (Case No. 22-5127)." Federal Election Commission, *FEC implements new enforcement case closure procedures* (Apr. 3, 2024) ("Case Closure Procedures"), https://www.fec.gov/updates/fec-implements-new-enforcement-case-closure-

8

procedures/.  Under the Case Closure Procedures, "when the Commission formally votes to close an enforcement matter, that action [is] effective 30 days after the Commission Secretary certifies the Commission's vote." *Id.*   If, after the 30 days have elapsed the Commission has taken no intervening action, and the file closes, "[d]isposition letters [are] sent to the complainant(s) and respondent(s)" and the file, which would include any statement of reasons, is publicly released. *See id.*  Complainants then have "a full 60 days from the day they are notified of the case's outcome to determine whether to seek judicial review," because they will be notified "on the day the file officially closes." *See id.*

## II.      FACTUAL BACKGROUND

### A.  The FEC's Consideration of the Administrative Complaint

On November 14, 2023, Rev. David Lewicki and Vladimir Shklovsky filed an amended administrative complaint with the FEC against the American Coalition for Conservative Policies ("ACCP"), Policies, Solutions, and Action for America ("PSAA"), Right on Issues, Inc., Georgia United Victory, RightOn Time, Georgia Action Fund, John Fogarty, Jr., in his personal capacity, Christopher Marston in his personal capacity, Moses Ayala in his personal capacity, Caleb Crosby in his personal capacity, Paul Kilgore in his personal capacity, Kayla Glaze in her personal capacity, and Unknown Respondent(s), (collectively "Respondents").  (*See* AR00123-88.)

The administrative complaint alleged a complex scheme to make conduit contributions through a series of intermediaries disguise the identities of the true source or sources of the funds in violation of FECA.  According to the administrative complaint, Unknown Respondent(s) gave five million dollars to ACCP, which in turn made transfers to two intermediary nonprofit corporations, PSAA and  RightOn Issues, entities which then allegedly made electioneering

expenditures and various transfers to three independent expenditure-only political committees, Georgia United Victory, Georgia Action Fund, and RightOn Time. (*See id.*)

The Commission notified the Respondents of the administrative complaint and received their responses. (*See* AR0051-70; AR00083-87; AR00092-98; AR00116-19; AR00120-22; AR00189-202; AR00216-24; AR00225-29; and AR00230-32.) After evaluating available information, OGC drafted an FGCR, providing the report to the Commission on May 3, 2024. (AR00233-338.)

On June 25, 2024, the Commission voted on two motions. The first motion proposed numerous findings and actions, and decisions to take no action, that varied with respect to each alleged violation of FECA and the various respondents at issue in the administrative complaint. (AR00339-41.) Among other things, the first motion proposed finding reason to believe that the Unknown Respondents had "violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b) by making a contribution in the name of another person[,]" and that ACCP, PSAA, and RightOn Issues Inc., had "violated 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b) by knowingly permitting its name to be used to effect a contribution in the name of another person." (AR00339-40.) The motion also proposed taking "no action at this time" as to whether Georgia United Victory, RightOn Time, Georgia Action Fund, Kayla Glaze and Paul Kilgore "violated 52 U.S.C. §§ 30104, 30122 and 11 C.F.R. §§ 104.1, 104.2, 104.3, 104.8, and 110.4(b) by knowingly accepting, and failing to report, a contribution in the name of another person." (AR00340.) Additionally, the motion proposed the Commission take "no action at this time" as to whether ACCP, PSAA, and RightOn Issues, Inc., "violated 52 U.S.C. §§ 30103, 30104 and 11 C.F.R. §§ 102.1(d) and 104.1 by failing to register and report as political committees" and "whether John Fogarty, Jr., Christopher Marston, Moses Ayala, and Caleb Crosby, in their personal capacities, violated

10

52 U.S.C. §§ 30103, 30104 and 11 C.F.R. §§ 102.1(d), 104.1, 104.2, 104.3, and 104.8 by causing American Coalition for Conservative Policies, Policies, Solutions and Action for America, and RightOn Issues to [fail] to register and report as political committees." (AR00340-41.) This motion failed by a Commission vote of 3 to 3. (AR00339-41.) Commissioners Shana M. Broussard, Dara Lindenbaum, and Ellen L. Weintraub voted affirmatively for the motion. Commissioners Sean J. Cooksey, Allen Dickerson, and James E. "Trey" Trainor dissented. That same day, the Commissioners voted on a second motion to dismiss MUR 8110 and close the administrative file effective 30 days from the vote's certification by the Commission Secretary, but that vote also split 3-3 with Commissioners Cooksey, Dickerson, and Trainor voting affirmatively for the motion, and Commissioners Broussard, Lindenbaum, and Weintraub dissenting, and thus did not succeed. (AR00341.) On July 3, 2024, the Commissioners voted 6-0 to close the administrative file for MUR 8110 effective 30 days from the vote's certification by the Commission Secretary. (AR00343.)

### B. The Statement of Reasons

On July 29, 2024, before the file was closed and made public on August 2, the three Commissioners (the "Controlling Commissioners") who voted against finding reason to believe a violation occurred issued a Statement of Reasons explaining their votes. (AR00344-50.)[1]

In the Statement of Reasons, the Commissioners first addressed the standard of review for finding reason to believe that a FECA violation has occurred. (AR00345-47.) The Controlling Commissioners stated that the standard enunciated in the FGCR was incorrect, characterizing it as requiring no more than "mere speculation." (*See id.*) They further stated

---

[1]    As these Commissioners voted not to proceed with enforcement, they are considered the "controlling group" whose "rationale necessarily states the agency's reasons for acting as it did." *See Nat'l Republican Senatorial Comm.*, 966 F.2d at 1476.

11

that, pursuant to agency precedent, "the Commission will only find [reason to believe] when the complaint credibly alleges a violation, and that the Commission is forbidden from finding [reason to believe] on the basis of assertion, insinuation, speculation, or conjecture." (AR00346.)

The Controlling Commissioners then performed a substantive analysis of the allegations that respondents violated the bar on conduit contributions as set forth in 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b)(2). (*See* AR00347-50.) After quoting the statutory language, they explained that, under 52 U.S.C. § 30122, "'[t]he legal question is whether the[] contributions were in fact made by others, using the titular contributors as mere conduits' who 'made their contributions at the direction of another.'" (AR00347; *id.* n.19-20.) In support, they provided a footnote quoting another statement of reasons issued by the same Commissioners, in which, describing the approach of the courts, they stated that "the statute reaches so-called 'straw donor' arrangements: where *A* gives a contribution to *B* with the intention that *B* immediately transfer those funds to *C*, but *C*, whether unknowingly or corruptly, reports the donation as coming from *B*, rather than *A*." (AR00347 n.20 (quoting Statement of Reasons of Vice Chairman Cooksey and Commissioners Dickerson and Trainor at 2, MUR 7464 ("LZP"), July 7, 2023 ("Statement of Reasons, MUR 7464"), https://www.fec.gov/files/legal/murs/7464/7464_90.pdf (citing *O'Donnell*, 608 F.3d 546; *United States v. Boender*, 649 F.3d 650 (7th Cir. 2011); *United States v. Whittemore*, 776 F.3d 1074 (9th Cir. 2015)).) In describing the standard, Commissioners stated that, in conduit contribution cases:

> "[T]here must be" credible, evidence-based reasons—and not mere speculation—to believe that the relevant contributors all "made their contributions at the direction of another." We require this evidence of control to distinguish complaints brought on a concrete and plausible basis from conspiracy theories positing that all

12

> transfers among politically-active organizations are in fact
> masterminded by some nefarious individual hiding in the wings.

(AR00348; *id.* n.27 (quoting Statement of Reasons of Chairman Cooksey and Comm'rs

Dickerson and Trainor at 10, MUR 8082 ("Unknown Respondents"), Apr. 8, 2024,

https://www.fec.gov/files/legal/murs/8082/8082_70.pdf.)

After explaining the law governing conduit contribution cases, the Commissioners

applied the law to the facts alleged in the administrative complaint.  (*See* AR00347-50.)  The

Commissioners considered the lack of credible allegations regarding the timing of the transfers,

noting that "the critical question for the Commission was what evidence existed for the

allegation that an unknown respondent contributed to ACCP with the direction that those funds

be ultimately contributed to RightOn Issues, Georgia United Victory, RightOn Time, and

Georgia Action Fund after being transferred through intermediaries."  (AR00349.)  The

Controlling Commissioners also considered other factors, including that:  (1) the majority of the

alleged concerning spending was undertaken by RightOn Issues, which received more than two

million dollars in unrelated contributions; (2) RightOn Issues, an independent entity, was the

only contributor in the scheme to two of three Super PACs implicated in the scheme; (3) $2.127

million of the five million dollars was devoted to unspecified "likely electioneering"; and (4) the

Commissioners must "engage with Respondents' denials, which are categorical, albeit

imprecise."  (AR00349-50.)  Taking these "illustrative examples" into account, the Controlling

Commissioners concluded that there was insufficient evidence for reason to believe a violation

of FECA occurred.  (AR00350.)

Consistent with the procedures set forth above, in the absence of any additional action by

the Commission, the matter was dismissed on August 2, 2024, and notifications were sent to

plaintiffs and respondents, explaining the Commission's action in the MUR, and enclosing the

Statement of Reasons. (AR00351-401.) That same day, the case file was released to the public via the FEC's website, including the Statement of Reasons, as well as other documents customarily released in accord with the Commission's disclosure policy.

## III.    PROCEDURAL HISTORY

Plaintiffs filed the instant suit against the Commission on August 30, 2024. (*See generally* ECF No. 1, Compl.) On November 18, 2024, the Commission moved to dismiss Count II of the Complaint for failure to state a claim upon which relief can be granted. (*See generally* ECF No. 5, Mot. to Dismiss.) On March 19, 2026, the Court ordered the parties to brief Counts I and III, and ordered that the FEC's motion to dismiss be held in abeyance, to address all claims together. (Minute Order, filed Mar. 19, 2026.) Plaintiffs filed their Motion for Partial Summary Judgment on May 12, 2026. (ECF No. 17, Pls.' Mot. for Partial Summ. J. ("Mot.").)

ARGUMENT

## I.    LEGAL STANDARDS

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). The court must "view the record in the light most favorable to the party opposing the motion, giving the non-movant the benefit of all favorable inferences that can reasonably be drawn from the record and the benefit of any doubt as to the existence of any genuine issue of material fact." *Defs. of Wildlife v. Dep't of*

14

*Agric.*, 311 F. Supp. 2d. 44, 53 (D.D.C. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970)).  "To determine which facts are 'material,' a court must look to the substantive law on which each claim rests."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986)).  "A 'genuine issue' is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action."  *Id.* (citing *Celotex*, 477 U.S. at 322, and *Anderson*, 477 U.S. at 248).

## B.  Legal Standard Under 52 U.S.C. § 30109(a)(8)

Where summary judgment is sought regarding a dismissal decision, a court grants summary judgment to the challenger only if the agency's decisions are "'contrary to law.'" *CREW v. FEC*, 209 F. Supp. 3d 77, 85 (D.D.C. 2016) (quoting 52 U.S.C. § 30109(a)(8)(C)); *see also Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986).  The Commission's decision is "'contrary to law' if (1) the FEC dismissed the complaint as a result of an impermissible interpretation of the Act . . . , or (2) if the FEC's dismissal of the complaint, under a permissible interpretation of the statute, was arbitrary or capricious, or an abuse of discretion."  *Orloski*, 795 F.2d at 161 (citing *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31 (1981); *In re Carter-Mondale Reelection Comm.*, 642 F.2d 538, 542 (D.C. Cir. 1980)).  The court's task is a "narrow[] inquiry into whether the Commission's construction was 'sufficiently reasonable.'" *Democratic Senatorial Campaign Comm.*, 454 U.S. at 39 (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978); *Train v. Nat. Res. Def. Council*, 421 U.S. 60, 75 (1975)).  "Whether the FEC's decision is unanimous or deadlocks in an evenly divided vote, the same standard for judicial review applies."  *CREW v. FEC*, 316 F.Supp.3d 349, 366 (D.D.C. 2018) (citing *FEC v.*

15

*Nat'l Republican Senatorial Comm.*, 966 F.2d 1471, 1476 (D.C. Cir. 1992); *In re Sealed Case*, 223 F.3d 775, 779 (D.C. Cir. 2000)).

Because plaintiffs' Counts I and III allege that the Commission acted "contrary to law" by, respectively: (1) providing a *post-hoc* explanation of the dismissal of their administrative complaint; and (2) improperly interpreting the contours of the bar on conduit contributions, the *Orloski* standard governs the Court's review here.[2]

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED TO THE COMMISSION ON COUNT ONE BECAUSE THE CONTROLLING COMMISSIONERS' EXPLANATION OF THE DISMISSAL OF PLAINTIFFS' ADMINISTRATIVE COMPLAINT WAS CONTEMPORANEOUS

The Statement of Reasons explaining the Controlling Commissioners' decision to dismiss plaintiffs' administrative complaint was contemporaneous because plaintiffs' rights were not adversely affected until the date that the dismissal became effective—the very day that the Statement of Reasons was released.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (explaining that agency action is not final until a party's rights are "determined"); AR00343-51.  However, even if the Court considers the relevant date for file closure to be the day of the vote—and thus considers the Statement of Reasons to have been issued 26 days later—the time between the vote to close and the issuance of the Statement of Reasons is reasonable.

---

[2]  The en banc D.C. Circuit is currently considering whether *Orloski* "correctly held that an FEC decision can be 'contrary to law' under 52 U.S.C. § 30109(a)(8)(C)" if the FEC's dismissal was "'arbitrary or capricious, or an abuse of discretion.'"  *See* Per Curiam Order, *End Citizens United PAC v. FEC.*, No. 22-5277 (D.C. Cir. Oct. 15, 2024).

Plaintiffs argue that *Loper Bright Enter. v. Raimondo*, 603 U.S. 369 (2024), indicates that Commissioners are due no deference in their analysis of the bar on conduit contributions.  But the Court need not examine *Loper Bright* in its analysis here:  the Controlling Commissioners did not act contrary to law, and the *Orloski* standard remains binding precedent, as plaintiffs note.  (*See* Mot. at 2, 21, 30, 39 (citing *Orloski*).)

### A.  The Commission Issued a Contemporaneous Statement of Reasons

#### 1.The Statement of Reasons Issued When the Reason to Believe Vote Resulted in an Order of Dismissal

Because the Controlling Commissioners issued their Statement of Reasons "at the time" when the split vote on reason to believe in MUR 8110 "result[ed] in an order of dismissal," the Commission provided a contemporaneous explanation for its action.  *See ECU*, 69 F.4th at 921 (quoting *Common Cause*, 842 F.2d at 449).  It is a "'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'"  *Regents*, 591 U.S. at 20 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)).  Thus, in a challenge to the FEC's dismissal of an administrative complaint pursuant to 52 U.S.C. § 30109(a)(8), "[a] statement of reasons . . . is necessary to allow meaningful judicial review of the Commission's decision not to proceed."  *Common Cause*, 842 F.2d at 449.  Timely explanations permit meaningful judicial review and advance agency accountability.  *See ECU*, 69 F.4th at 923.

Plaintiffs filed the administrative complaint on November 9, 2023.  (AR00001-50; AR00123-88.)  Over the course of the next year, the Commission received and reviewed responses from all known administrative respondents.  (*See* AR00083-87; AR00092-98; AR00116-19; AR00120-22; AR00216-24; AR00225-29; and AR00230-32.)  The Commission then considered the FGCR circulated by OGC.  (*See* AR00233-77; AR00278-338.)  At an executive session on June 25, 2024, the Commission deliberated and then split 3-3 in a vote on whether to find reason to believe that FECA was violated; and the vote was certified on July 2, 2024.  (*See* AR00339.)  On July 3, 2024, the Commissioners voted 6-0 to close the file.  (AR00343).  As discussed *infra* Part II.A.1.b, the Commissioners then had an additional 30 days to reverse course, revise, or come to consensus.  Twenty-six days later, on July 29, 2024, the

Controlling Commissioners signed their Statement of Reasons articulating the reasoning for their conclusion that there was no reason to believe FECA was violated.  (AR00344-51.)  The vote to close the file became effective on August 2, 2024, "30 days from the date of certification of [the] vote."  (AR00343.)  August 2, 2024, then, "mark[ed] the consummation of the agency's decisionmaking process'" constituting "final action" from the agency, of which plaintiffs could seek judicial review.  *See Bennett*, 520 U.S. at 178 (internal quotation marks and citations omitted); *see also* 52 U.S.C. § 30109(a)(8)(A)-(B) (explaining that administrative complainants may file a suit seeking judicial review of a dismissal "within 60 days *after the date of the dismissal*" (emphasis added)).  Put differently, prior to the effective date of the dismissal vote, the "rights or obligations" of plaintiffs were unaffected and no "legal consequences . . . flow[ed]."  *Bennett*, 520 U.S. at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  And, the Statement of Reasons, which preceded the date of dismissal vote, was thus contemporaneous with the inception of the "legal consequences."  *See id.*

The statutory structure of the FEC supports this conclusion.  Under 52 U.S.C. § 30109(a)(8), only a party that is "aggrieved" by the dismissal of administrative complaint "may file a petition" with the district court within "60 days after the date of the dismissal."  *Id.* § 30109(a)(8)(A)-(B).  The 60-day clock for plaintiffs did not begin to run until August 2, 2024 (*see* AR00343 (explaining that the file closure would become effective "30 days from the date of certification")), at which point plaintiffs became "aggrieved."  *See CREW v. FEC*, No. 22-cv-3281 (CRC), 2023 WL 6141887, at *7 (D.D.C. Sept. 20, 2023) (explaining that a party that is "aggrieved" is one "having legal rights that are adversely affected" and concluding that CREW was not "aggrieved" by a vote not known to it (quoting Aggrieved, Black's Law

18

Dictionary (11th ed. 2019)).  In sum, because the Statement of Reasons was penned prior to and released on the very "date of the dismissal," *see* 52 U.S.C. § 30109(a)(B), it provided a contemporaneous explanation of the dismissal required.  *See ECU*, 69 F.4th at 921.  Plaintiffs' characterization of the Statement of Reasons as a *post-hoc* rationalization fails.

### 2.The Explanation for the Reason to Believe Vote Is The Proper Subject for Judicial Review

In large part, plaintiffs' argument that the Statement of Reasons is a *post-hoc* explanation turns on a misapprehension of the Court's object of review in cases arising under 52 U.S.C. § 30109(a)(8).  Specifically, plaintiffs appear to challenge whether the Statement of Reasons for the split vote to find reason to believe is the appropriate focus for judicial review.  Instead, plaintiffs argue that judicial review should home in on the explanation behind the vote to dismiss, divorced from the vote for reason to believe:  an explanation that plaintiffs contend is absent.  (*See* Mot. at 23-24.)

This is a tortured reading of precedent.  *See, e.g., CREW*, 892 F.3d at 437 ("[F]or purposes of judicial review, the statement or statements of those naysayers—the so-called 'controlling Commissioners'—will be treated as if they were expressing the Commission's rationale for dismissal.").  As plaintiffs point out, the Court may presume that the dismissal is "due to [the] deadlock" on whether to find reason to believe that FECA has been violated.  (*See* Mot. at 22 (quoting *Democratic Cong. Campaign Comm. v. FEC*, 831 F.2d 1131, 1132 (D.C. Cir. 1987).)  Where a majority has voted procedurally to close the file in an otherwise deadlocked matter, the reasoning of the Commissioners who voted to proceed on the merits will simply be that the vote was split, thus begging the question that only review of the controlling group's reasons can answer.  Consequently, the Court properly considers the statement of

19

reasons for the reason to believe vote, rather than a hypothetical separate reason underlying the vote to close the file and dismiss.

As a corollary, despite plaintiffs' protestations to the contrary, the FGCR is not the only "rationale" the Commission must consider when voting on whether reason to believe exists. (*See* Mot. at 20.) The Commission must consider the "administrative record" in voting on whether reason to believe exists to pursue an investigation, which is what the Court, in turn, must consider. *See Free Speech for People v. FEC,* No. cv 22-666 (CKK), 2024 WL 3617481, at *1 (D.D.C. Aug. 1, 2024) (considering the "briefing, the relevant legal authorities, and the administrative record" in dismissing plaintiffs' complaint); *Nader v. FEC*, 823 F. Supp. 2d 53, 59-60 (D.D.C. 2011) ("The Court finds that the administrative record and the FEC's reasoning (in general) support its decision."); *cf.* AR00350 ("[E]ven if we chose to credit OGC's theorizing concerning these various issues, we would have to engage with Respondents' denials."). The administrative record here is not limited to the FGCR. It includes additional evidence and reasoning submitted by complainants and respondents. (*See generally* AR0001-50; AR00083-87; AR0092-98; AR00107-15; AR00117-88; AR00216-32.)

### 3. The Time Between the Vote to Close and the Statement of Reasons is Reasonable

Even assuming the relevant date is July 3, 2024, the day that the Commissioners voted to close the file, as plaintiffs urge, the 26 days between the vote and the issuance of the Statement of Reasons is reasonable and serves the "important statutory policies" of 52 U.S.C. § 30109. *See Common Cause*, 842 F.2d at 449. *Common Cause* provides the familiar set of "important statutory policies" served by providing an explanation for split-vote dismissals. *See Id.* First, explanations "'allow meaningful judicial review of the Commission's decision not to proceed' and guard[] against the risk that similarly situated parties may not be treated evenhandedly."

20

*ECU*, 69 F. 4th at 920 (quoting *Common Cause*, 842 at 449). Second, they "'contribute[] to reasoned decisionmaking by the agency' by 'ensur[ing] reflection and creat[ing] an opportunity for self-correction.'" *Id.* (quoting *Common Cause*, 842 F.2d at 449). Third, explanations "'enhance[] the predictability of Commission decisions for future litigants.'" *Id.* (quoting *Common Cause*, 842 F.2d at 449).

### a. The Statement of Reasons Allows Meaningful Judicial Review of the Commissioners' Decision to Close the File

The time that elapsed between the Commission's vote to close the file and the issuance of the Statement of Reasons does not inhibit "meaningful judicial review" of the real-time thinking that informed the Controlling Commissioners' decision not to proceed. *See Common Cause*, 842 F.2d at 449. Though a statement could come so late as to do so, there is no bright line for determining "just how 'contemporaneous' a 'contemporaneous' statement must be.'" *CREW*, 2023 WL 6141887, at *12; *contra* Mot. at 21 ("[T]he Commissioners did not . . . approve an analysis at the time of the vote that could explain their actions.").

There is evidence here that the Statement of Reasons represents the Controlling Commissioners' contemporaneous thinking and allows meaningful judicial review of its decision—and no evidence that it does not. First, it was not a device to block the assessment of the dismissal vote by a court. The statute of limitations for the violations alleged did not run until 2025, roughly a year after the Statement of Reasons was issued on July 29, 2024. *See* 52 U.S.C. § 30145(a) ("No person shall be . . . punished for any violation of" the Act "unless . . . the information is instituted within 5 years after the date of the violation."); AR00283 ("ACCP organized as a nonprofit corporation in the District of Columbia on March 23, 6 2020."); AR00207-13 (agreements of all respondents to toll the statute of limitations for 30 days). Thus, the Statement of Reasons did not categorically come too late because it was not issued "after the

21

commencement of the underlying litigation and the expiration of the statutory deadline to challenge the dismissal." *ECU*, 69 F.4th at 921, 923-24.

Second, the 60-day clock for plaintiffs to lodge their suit did not begin to run until the time the vote became effective, four days after the Statement of Reasons was issued, so the Statement was clearly not so belated as to prevent "parties and the public [from] respond[ing] fully and in a timely manner to an agency's exercise of authority." *See id.* at 922.  Plaintiffs filed their 27-page Complaint within the 60-days required by statute, *see* 52 U.S.C. § 30109(a)(8)(B), and litigation has been proceeding in an orderly fashion.  (*See* Compl.)

Third, the "orderly functioning of the process of review" was not hampered.  *See ECU*, 69 F.4th at 923 (quoting *Regents*, 591 U.S. at 23).  The FEC followed its Case Closure Procedures, discussed *infra* Part II.B.1, to the letter, and, more generally, the agency followed each step of the administrative process transparently.  (*See generally* AR0001-401.)  The Statement of Reasons was released less than four weeks later—a minimal amount of time— speaking to the agency's accountability and transparency.  *See ECU*, 69 F.4th at 922.  Plaintiffs cite to a vote certification in MUR 8122 (Lafazan for Congress) as evidence that a Factual and Legal Analysis, as recommended in the FGCR, should be approved at the time of a reason to believe vote and one to close the file.  (*See* Mot. at 21 (citing (Certification, MUR 8122 (Lafazan for Congress), Feb. 6, 2024, https://www.fec.gov/files/legal/murs/8122/8122_13.pdf).)  Here, plaintiffs misapprehend the difference between a Factual and Legal Analysis and a Statement of Reasons.  Commissioners cooperatively edit and amend a Factual and Legal Analysis drafted prior to a meeting by OGC because it presents the view of the Commission, as opposed to the view of controlling commissioners, who must draft their statements of reason in full.  And after a substantive vote to adopt a Factual and Legal Analysis, the Commission often sends it back for

22

further revision by OGC.  Further, nothing in MUR 8122 indicates that the Commissioners are bound to this course of action and that, in departing from it here, the Statement of Reasons is untimely.

Moreover, from a practical standpoint, a brief delay is often unavoidable.  As discussed *infra* Part II.A.1.b, Commissioners may wish to revisit their decision prior to the set date of dismissal  But in any event, assuming that Commissioners do not arrive at the meeting with statements of reason in hand, expecting a statement of reasons to be released the day of the vote or even within just a few days is an impossible task for a small agency balancing a number of competing priorities.  *See FEC v. Rose*, 806 F.2d 1081, 1091 (D.C. Cir. 1986) ("It is not for the judiciary to ride roughshod over agency procedures or sit as a board of superintend[e]nce directing where limited agency resources will be devoted.").  Commissioners often consider more than one administrative complaint at each meeting, in addition to, *inter alia*, proposed rulemakings, audits, litigation, personnel issues, and agency policy, and Commissioners need time to perfect a draft.  *See, e.g.*, 52 U.S.C. § 30107 (setting forth the powers of the Commission that may only be exercised upon a vote of four or more Commissioners, as required by 52 U.S.C. § 30106(c)); *see also* Federal Election Commission, *Commission meetings—Executive sessions*, https://www.fec.gov/meetings/?tab=executive-sessions.  That the "decision-making and explanation-authoring" authorities may differ is irrelevant.  (*See* Mot. at 23-24.)  The practicalities of drafting statements of reason are identical.

Further, absent strong evidence to the contrary, "agencies benefit from a presumption of motivational regularity" in the summary judgment context.  *See League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 177 (D.D.C. 2025), *judgment entered*, No. 25-cv-0946 (CKK), 2026 WL 880056 (D.D.C. Mar. 31, 2026).  For example,

23

"courts presume that administrative law judges are unbiased and that their adjudications are not tainted by partiality." *See id.*; *CREW v. FEC*, 380 F. Supp. 3d 30, 44 (D.D.C. 2019), *aff'd*, 993 F.3d 880 (D.C. Cir. 2021) ("[C]ourts presume that [public officers] have properly discharged their official duties." (quoting *Latif v. Obama*, 666 F.3d 746, 748 (D.C. Cir. 2011)).

### b. The Timing of the Statement of Reasons Contributed to Reasoned Decision Making by the Agency

A short time between the vote to close the file and the issuance of a statement of reasons, like that which occurred here, may also "'contribute[] to reasoned decisionmaking by the agency'" by "'ensur[ing] reflection and creat[ing] an opportunity for self-correction.'" *See ECU*, 69 F.4th at 920 (quoting *Common Cause*, 842 F.2d at 449). Requiring Commissioners to come to the deliberating table with a fully drafted statement of reasons, operative at the precise moment of the vote, (*see contra* Mot. at 21), is an extreme position that would frustrate the bipartisan design of the Commission.

Though Congress recognized and planned for the possibility that Commissioners may split in a vote to proceed with an enforcement action, *see Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1170-71 (D.C. Cir. 2016) (discussing the Congressional design of split votes), decisions on whether FECA has been violated are, in the first instance, the province of the Commission. *See* 52 U.S.C. § 30109(a)(1) ("Any person who believes a violation of [FECA] has occurred, may file a complaint with the Commission."); *see id.* § 30109(a)(8) (providing for judicial review of the agency's decision to dismiss a complaint).

Permitting a reasonable time to pass between a vote to close and the issuance of a statement of reasons may facilitate nonpartisan functioning and enable "reasoned decisionmaking" that is less likely to be second-guessed by the courts. *See ECU*, 69 F.4th at 920 (quoting *Common Cause*, 842 F.2d at 449). Commissioners are afforded the opportunity to

24

deliberate before a formal vote to persuade and inform their colleagues, *before* the matter may be appealed for judicial review.  Indeed, deliberation is the *sin qua non* of a Commission meeting. *See* 11 C.F.R. § 2.2(d)(1) ("Meeting means the deliberation of at least four voting members of the Commission in collegia where such deliberations determine or result in the joint conduct or disposition of official Commission business.").  Requiring that the Commissioners come armed with a statement of reasons undercuts the regulatory framework that envisions deliberation.  *See id.*  It would turn Commission meetings on enforcement matters into rubber stamp-sessions, operating on a presumption that Commissioners have their minds made up before they walk into the hearing room.  That the Commissioners do not always reach a majority needed to initiate an investigation does not render deliberation fruitless.  Deliberation may inform whether and how the Controlling Commissioners address the concerns of their colleagues in the final pronouncement, a boon to the "accountability" of the agency.  *See ECU*, 69 F.4th at 922 (quoting *Regents*, 591 U.S. at 22).

Moreover, the effective date of the closing of the file being a short time after the vote provides an additional  chance for self-correction.  *See Common Cause*, 842 F.2d at 436. Although the Commission's decision to dismiss will result in final agency action if no further action occurs by the file closure, Commissioners are free in the meantime to break the deadlock, if possible, correct errors, or change course.

Plaintiffs turn this proposition on its head, arguing that, because the Statement of Reasons here was not issued at the instant the Commissioners voted to dismiss, there was no "opportunity for self-correction."  (*See* Mot. at 22 (quoting *Common Cause*, 842 F.2d at 449).)  But as set forth above, deliberation occurs at the meeting where Commissioners vote on whether there is reason to believe FECA has been violated.  *See* 11 C.F.R. § 2.4; 52 U.S.C. § 30109(a)(2).  It is

25

chiefly there that Commissioners to "review the justification of a different set of commissioners." (*See* Mot. at 22.) And, again, a reasonable amount of time after the vote permits Commissioners to have a further opportunity to change course.

In any event, it is unclear how short-changing the Commission's ability to deliberate could be anything but detrimental to plaintiffs or other complainants. Not only would complainants be deprived of the opportunity for Commissioners to thoroughly consider their complaint, requiring the release of a statement of reasons at the moment of a vote may contribute to concerns that partisanship rather than reasoned, nonpartisan analysis compelled the final result, particularly where the vote split along party lines.

Finally, plaintiffs' concern that the Commission may reconsider its decision at any time, such that "no [action] would ever count as final," (*see* Mot. at 27 (quoting *NRDC v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020)), is irrelevant here, where the Commission has set a deadline by which the vote *will* become effective. *Compare* AR00343 (voting to "[c]lose the file effective 30 days from the date of certification" of the vote), *with Wheeler*, 955 F.3d at 78 (explaining that an interim resolution is final even "even if the [rule] were to be displaced by another rule *at some point*" (emphasis added)). The decision here differs from the issuance of a rule under Administrative Procedure Act, which explicitly contemplates that a rule (and thus final, reviewable agency action) may have "future effect." *See Humane Soc'y of the United States v. USDA*, 41 F.4th 564, 571 (D.C. Cir. 2022) (quoting 5 U.S.C. § 551(4)). Because the vote is not effective until 30 days after the vote certification, during which time the Commissioners may come to consensus, it is the effective date that governs here.

26

c. **The Statement of Reasons Enhances Predictability for Future Litigants**

Finally, the Statement of Reasons, even if considered to have been issued a few weeks after the vote, nevertheless enhances "predictability . . . for future litigants" by providing well-reasoned justification for the decision to dismiss the administrative complaint. *See ECU*, 69 F.4th at 923 (quoting *Common Cause*, 842 F.2d at 449). As set forth above, the time between the vote and the explanation is not so great as to indicate that the Statement of Reasons is not a true reflection of the Controlling Commissioners' real-time thinking.

B. **The Commission's Treatment of the Complaint Complied with *ECU***

The Commission's treatment of the administrative complaint here complied with the D.C. Circuit's decision in *ECU*. After the *ECU* decision, the Commission revised its processes to bring them into compliance with the Court's holding that the agency had not provided a sufficiently contemporaneous explanation for its dismissal of an administrative complaint and thus acted contrary to law. *See* Case Closure Procedures. The Case Closure Procedures are a reasonable, carefully tailored response to *ECU*, and the Commission's adherence to them in this case demonstrates that the Statement of Reasons was sufficiently contemporaneous. Moreover, the two courts that have had occasion to evaluate the timing of the agency's explanations for dismissal decisions in closely analogous circumstances have concluded—guided in part by *ECU*'s reasoning—that the agency's actions were not contrary to law. This Court should follow the careful reasoning of those courts here and find that the Statement of Reasons was sufficiently contemporaneous.

1. **The Agency Adhered to Its Case Closure Procedures Adopted to Address the Concerns in *ECU***

The *ECU* court considered whether the agency acted contrary to law when the controlling Commissioners there provided a statement of reasons explaining the vote to dismiss an

administrative complaint four days after the plaintiff filed suit against the Commission and two months after the vote occurred. *See ECU*, 60 F.4th at 919. Following the contours of *Common Cause*, the Circuit Court held that the statement of reasons constituted impermissible *post-hoc* reasoning for the dismissal and remanded the case to the district court, instructing it to remand to the Commission for further action. *See id.* at 924. In response to *ECU*, the agency adopted its Case Closure Procedures. *See* Case Closure Procedures.

Because a case is not dismissed for purposes of 52 U.S.C. § 30109(a)(8) until the administrative file is closed, the Case Closure Procedures ensure that dismissal becomes effective at the same time as the reasons for the dismissal are provided to the complainant, the respondents, and the public. *See CLC v. 45Committee, Inc.*, 118 F.4th 378, 382 (D.C. Cir. 2024) (explaining that, in the context of a split reason to believe vote, the Commission must then vote to close the administrative file to "terminate[] the proceedings" (quoting 11 C.F.R. §§ 111.9(b), 111.20(a)). Where a reason to believe vote splits, the Case Closure Procedures ensure that agency's explanation is contemporaneous and reflects Commissioners' real-time thinking because it occurs "'at the time when a deadlock vote *results in* an order of dismissal.'" *ECU*, 69 F.4th at 921 (quoting *Common Cause*, 842 F.2d at 449 (emphasis added)). They further ensure that "[a]dministrative complainants will have a full 60 days from the day they are notified of the case's outcome to determine whether to seek judicial review of the Commission's actions under 52 U.S.C. § 30109(a)(8), as they will be notified on the day the file officially closes." *See* Case Closure Procedures. The Case Procedures thus "instill[] confidence that the reasons given are not simply 'convenient litigating positions'" and "advance[]'the orderly functioning of the process of review.'" *ECU*, 69 F.4th at 922-23 (quoting *Regents*, 591 U.S. at 23). Nor are the Case Closure procedures an invitation for gamesmanship: during the 30 days between the vote

28

certification and the closing of the file, the Commission may come to a consensus (or at least a majority) after an initial split; reverse course entirely; or correct errors.  Consequently, the Case Closure Procedures are designed to guard against the ills of a *post-hoc* explanation that concerned the *ECU* court:  (1) failure to explain the Commission's real-time thinking; (2) evading "meaningful judicial review" by forcing litigants to "chase a moving target"; and (3) threatening agency accountability and diminishing predictability.  *See id.* at 921-23 (internal quotation marks and citations omitted).

The agency here carefully followed the Case Closure Procedures.  The Commission voted on July 3, 2024, to close the administrative file.  (AR00343.)  On July 29, 2024, the Controlling Commissioners issued their Statement of Reasons (*see* AR00344-51), and on August 2, 2024, the file was closed.  (*See* AR00352-401.)  The Case Closure Procedures comply with the *ECU* court's decision, were followed here, and demonstrate that the Statement of Reasons was not *post hoc*.

### 2. Two Courts In This District Have Confirmed the Agency Acted Contemporaneously in Analogous Circumstances

In any event, and separate from a review of the Case Closure Procedures as such, two courts in this district have concluded that the agency's actions accorded with the principles of *ECU* and provided contemporaneous explanations in analogous circumstances.  *See CLC v. FEC*, No. 1:19-cv-02336-JEB, 2025 WL 315143 (D.D.C. Jan. 28, 2025) ("*CLC*"); Opinion and Order, ECF No. 53, *CREW*, 1:22-cv-00035-CRC (D.D.C. Nov. 10, 2025).

In *CLC v. FEC*, plaintiff CLC contended that the Commission had not acted timely when, on remand from a conclusion that the agency's dismissal of CLC's complaint was contrary to law, the Commission held a split reason to believe vote, voted to close the file, and released the controlling Commissioners' statement of reasons 26 days later, pursuant to its newly-adopted

29

Case Closure Procedures. *See* 2025 WL 315143, at *2. CLC argued that because the statement of reasons was "not released at the time of the vote it [sought] to explain," it was "untimely and invalid." *See* Pl.'s Reply in Support of Motion for an Order Declaring that Defendant Has Failed to Conform, ECF No. 96, at *10-11 (filed Dec. 13, 2024); *see id.* *10 n.3 (arguing that statements of reason must be provided the day of a vote to close).

Looking to *ECU* as a guide for its analysis, the court rejected CLC's argument. *See CLC*, 2025 WL 315143, at *7. The court explained that the *ECU* court was "motivated chiefly by a concern" that the FEC's stated reasons for dismissal were "convenient litigating positions" and stated that, because it was unlikely the Commission had engaged in such "bait-and-switch" there, the court was capable of performing "'meaningful judicial review.'" *Id.* (citing and quoting *ECU*, 69 F.4th at 923). Though the court recognized that a statement of reasons "likely could be issued so long after the reason to believe vote that it could no longer qualify as demonstrative of the FEC's contemporaneous reasoning," the time that elapsed between the vote and the release of the majority statement of reasons fell "within the realm of reason." *Id.* The court further stated that, if it "accepts the agency's contention that the 30-day period between the vote and the vote's formal effective date allows 'the Commission to come to consensus (or at least a majority) after an initial split, reverse course entirely, or correct errors, . . . the Statement of Reasons are indeed contemporaneous with the no-reason-to-believe decision." *Id.*

In *CREW v. FEC*, the court was again faced with a timeliness challenge to the agency's decision making on remand from a decision that the Commission acted contrary to law. *See* Opinion and Order, at 2-4. Guided by the reasoning in *ECU* and *CLC*, the court concluded that providing a statement of reasons after the vote to close the file was "'within the realm of reason, in this context[,]' given the time it takes for agency personnel to put pen to paper." *Id.* at 7

30

(quoting *CLC*, 2025 WL 315143, at \*7).  The court also reasoned, *inter alia*, that CREW had not identified evidence "suggesting that post-decision gamesmanship occurred," or that controlling statement of reasons "depart[ed] from the agency's true rationale for deciding" not to proceed with enforcement.  *See id.*

The agency's actions are much the same as they were in *CLC* and *CREW*.  There is no evidence of gamesmanship here, such as cutting off avenues for litigation or surprising other Commissioners with unexpected reasoning (*see* Mot. at 23-24), and the 26 days that elapsed between the vote to close the file and the day statement of reasons was issued—identical to the time that passed in *CLC*—is well within the "realm of reason" required for Controlling Commissioners to compose their Statement.  *See CLC*, 2025 WL 315143, at \*7; *CREW*, Opinion and Order= at 7.  Litigation had not commenced prior to the release of the Statement of Reasons, nor was any action endangered by the statute of limitations.

Perhaps recognizing that their timeliness objections in near-identical circumstances have now been rejected by two courts, plaintiffs aim to distinguish *CLC* and *CREW* as answering "a distinctly different question" than that the plaintiffs pose in Count I.  (*See* Mot. at 27.)  Not so. True, the review necessary to evaluate the Commission's conformance with remand may differ from the substantive "contrary to law" review that a court must perform in a "merits-based appraisal" of a statement of reasons.  *See CLC*, 2025 WL 315143, at \*7.  But Count I is essentially a procedural complaint disputing "just how 'contemporaneous' a 'contemporaneous' statement must be," *see CREW*, Opinion and Order at 8 (quoting *CLC*, 2025 WL 315143, at \*12), rather than a substantive disagreement with the explanation set forth in the Statement of Reasons.  (*See* Compl. ¶¶ 52-57.)  Both courts felt comfortable following the lead of the *ECU* in evaluating timeliness.  *See CREW*, Opinion and Order at 4-8; *CLC*, 2025 WL 315143, at \*16

31

(explaining that "the Court can glean some important lessons from *ECU*'s treatment of the Statement of Reasons at issue in that case").  There is no evidence suggesting the agency engaged in gamesmanship here or that the Statement of Reasons has in any way departed from the agency's "true rationale" for deciding to vote to close the file.  *See CREW*, Opinion and Order at 7.  Nor did the agency neglect to release a statement of reasons "so long after the reason-to-believe vote that it could no longer qualify" as contemporaneous.  *See CLC*, 2025 WL 315143, at *7.  So, regardless of if plaintiffs question whether the Case Closure Procedures themselves are sufficient as a matter of law under *ECU*, in *this* case the Court is not called to determine "where th[e] line falls" because the timing is reasonable here.  *CLC*, 2025 WL 315143, at *7.  The Court should follow the *CREW* and *CLC* courts' clear reasoning and grant summary-judgment to the Commission on Count I.

## III.    SUMMARY JUDGMENT SHOULD BE GRANTED TO THE COMMISSION ON COUNT THREE BECAUSE THE CONTROLLING COMMISSIONERS' INTERPRETATION OF FECA'S CONDUIT STANDARD WAS NOT CONTRARY TO LAW

The Controlling Commissioners' fact-bound conduit analysis applied established legal principles to evaluate whether there was reason to believe contributions were made "in the name of another" and found that there was not.[3]  *See* AR00347-50; 52 U.S.C. § 30122.  Specifically, the Commissioners considered the administrative record, including the FGCR, plaintiffs' complaint, and respondents' submissions, including submissions under oath, and concluded that the "complex scheme" set forth by plaintiffs did not "credibl[y] alleg[e]" a violation of FECA. (*See* AR00344, 347-50.)

---

[3]    The Court instructed the parties to address only Counts I and III in their briefing.  (*See* Minute Order, Mar. 27, 2026.)  Because Count III presents a question of law, the FEC does not address the evidence considered by the Controlling Commissioners.  (*See* Compl. ¶¶ 67-72 (alleging that the Controlling Commissioners erroneously ignored or dismissed the evidence evinced by plaintiffs in the administrative complaint).)  Though the Commission reserves the

Plaintiffs' Count III focuses exclusively on the supposed legal shortcomings in the Controlling Commissioners' analysis. (Mot. at 32-40.) According to plaintiffs, the Controlling Commissioners' fatal error was "impos[ing] two atextual limits on the conduit contribution bar": (1) "that sources immediately pre-pay their conduits"; and (2) "that the conduit be under the control of the source." (*Id.* at 32.) The fundamental flaw in plaintiffs' arguments is not whether these "atextual limits" are contrary-to-law—a question that the Court need not reach. Rather, plaintiffs take issue with a legal analysis that the Controlling Commissioners never undertook in the first place. (*See* AR00344-51.) Because the Statement of Reasons neither announced nor followed faulty legal principles, the Court should grant the Commission summary judgment on Count III.

### A. The Controlling Commissioners Did Not Impose a Rule Limiting the Bar on Conduit Contributions to When the True Contributor Advances Money to a Conduit that Immediately Makes a Contribution

The Controlling Commissioners explained in the Statement of Reasons that FECA provides that "[n]o person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another." (AR00347 (quoting 52 U.S.C. § 30122; citing, *inter alia*, 11 C.F.R. § 110.4(b)(2).) Commissioners elaborated that, "[u]nder this provision, "'[t]he legal question is whether the[] contributions were in fact made by others, using the titular contributors as mere conduits' who 'made their contributions at the direction of another.'" (*Id.*) In support of these straightforward statements of the law, the Controlling Commissioners cited a variety of authorities, including 52 U.S.C. § 30122, the statutory

---

right to brief Counts II and IV in full pursuant to the Court's instructions, for avoidance of doubt, the Controlling Commissioners did not act contrary to law in their application of the law to the facts because they considered the record as a whole and properly dismissed the administrative complaint.

provision governing conduits, 11 C.F.R. § 110.4(b)(2), the implementing regulation, which provides non-exhaustive examples, and several previous statements of reason in which Commissioners recited the governing law.  (AR00347 n.19-20.)

Plaintiffs do not appear to object to the Controlling Commissioners' unambiguous formulation of the law.  (*See generally* Mot.)  Instead, looking to footnote 20 in the Statement of Reasons, they seize on a single quotation that, in their view, demonstrates that the Controlling Commissioners adopted an "atextual" limitation on the conduit contribution bar by requiring that conduit contributions be advances, not reimbursements, and be made to the intermediary "immediately" before payment to the ultimate recipient.  (Mot. at 32, 37-38.)  Specifically, they contest the Commissioners' statement that FECA prohibits "'straw donor' arrangements:  where *A* gives a contribution to *B* with the intention that *B* immediately transfer those funds to *C*, but *C*, whether unknowingly or corruptly, reports the donation as coming from *B*, rather than *A*.'" (AR00347 n.20 (quoting Statement of Reasons, MUR, at 2 and citing *O'Donnell*; *Boender*; *Whittemore*).)  Putting aside that plaintiffs find fault with a footnote, rather than the body of the Statement of Reasons announcing the governing law, their crabbed reading mischaracterizes the quotation:  Commissioners did not announce a new rule that reimbursements could no longer violate the conduit contribution bar, nor did they impose a particular timing requirement for either advances or reimbursements credibly to allege that FECA's conduit contribution provision was violated.

As plaintiffs point out, footnote 20 quotes the statement of reasons in MUR 7464, which itself cites a number of well-established conduit contribution cases.  (*See* AR00347 n.20 (quoting MUR 7464 at 2 and citing *O'Donnell*; *Boender*; *Whittemore*).)  But the barest review of that statement and the cases demonstrates what is evident from a plain reading:  the straw donor

34

scenario set forth in footnote 20 serves as an *example* of the kinds of payments that are barred by

52 U.S.C. § 30122 and was not intended to announce a rule limiting the operation of the statute.

*See* Statement of Reasons, MUR 7464 at 2-3.  Indeed, the quoted portion of MUR 7464 is a

description of what courts of appeal "typically" do, rather than what is done in every case.  *See*

*id.* at 2.  Taking account of the cited cases, the controlling commissioners in MUR 7464, who are

the very three who drafted the Statement of Reasons at issue here, go on to enunciate the full

standard drawn from caselaw, statute, and regulations:

> [W]e conclude that a person makes a contribution in the name of
> another when he or she knowingly: (1) solicits a person to make a
> contribution to a federal candidate or political committee in that
> person's own name, and (2) either advances the contributed funds
> *or promises to—and does—reimburse the contribution.*

*Id.* at 3.  In other words, the Controlling Commissioners cite to their own formulation in MUR

7464, where they concluded that reimbursements may constitute contributions in the name of

another without a particular timing limitation.  *See id.*  Citing to an example what § 30122

prohibits in a footnote in the Statement of Reasons does not repudiate the basic legal principles

that guide the analysis of conduit transfers, and to argue it does requires a singularly narrow

interpretation of the text, which the Court should reject.  (*See* AR00347 n.20.)

Plaintiffs also briefly point to AR00349—page six of the Statement of Reasons—to argue

that Controlling Commissioners have applied this "atextual limit[]" by requiring that an

intermediary make an "immediate" payment when money is advanced for a contribution to

qualify as a conduit contribution.  (Mot. at 32, 37-38.)  Though it is not clear precisely what

language plaintiffs dispute, it appears they quibble with the Controlling Commissioners' analysis

scrutinizing the timing of the alleged conduit transfers.  (*See id.* at 32, 34.)  But there is no

indication that the Controlling Commissioners announced a new legal rule.  As plaintiffs

themselves recognize, the timing of transfers is *often* a part of the evaluation of alleged conduit

transfers.  *See, e.g.*, Factual & Legal Analysis at 5, MUR 7903 (Tomfoolery, LLC, *et al.*), https://www.fec.gov/files/legal/murs/7903/7903_13.pdf (finding reason to believe where the record indicated that individual "transferred [funds] into the LLC on the days the contributions [to a super PAC] were made in order to cover the full contribution amounts").  The Controlling Commissioners say nothing novel in this regard.  (*See* AR00349 ("[T]he critical question for the Commission was what evidence existed for the allegation that an unknown respondent contributed to ACCP with the direction that those funds be ultimately contributed to RightOn Issues, Georgia United Victory, RightOn Time, and Georgia Action Fund after being transferred through intermediaries.").)

**B. The Controlling Commissioners Did Not Impose a Rule Requiring Total "Control" Over an Intermediary In a Conduit Scheme**

No more did Commissioners announce a new rule heightening the level of influence that a true contributor must have on a conduit.  (*See* Mot. at 32, 34-37.)  Again, plaintiffs ascribe to the Statement of Reasons more meaning than the plain text supports.  As set forth in the Statement of Reasons, "in conduit contribution cases, there must be credible, evidence-based reasons—and not mere speculation—to believe that the relevant contributors all made their contributions at the direction of another."  (AR00348 (internal quotation marks omitted).)  The Statement of Reasons continues that, "[w]e require *this evidence* of control to distinguish complaints brought on a concrete and plausible basis from conspiracy theories."  (*See* AR00348-49 (emphasis added).)  As drafted, then, the Controlling Commissioners are requiring evidence that contributions were "direct[ed]" by another; they are not requiring that, *e.g.*, the conduit be

36

owned by the true contributor nor foreclosing the possibility that an independent entity can be a conduit.

Though plaintiffs do not specify what they read the Commissioners to be requiring by imposing a heightened level of "control," they repeatedly cite law demonstrating that there can be no conduit contribution without the true contributor *directing* the conduit in some way to make a contribution to the ultimate recipient.  Indirect contributions, like those made in conduit schemes, are contributions that are "'in any way earmarked *or otherwise directed* through an intermediary or conduit to such candidate' are contributions from the source."  (*See* Mot. at 35 (quoting 52 U.S.C. § 30116(a)(8) (emphasis added); *see id.* ("The 'true source' of a contribution is the person who 'initiate[s] or instigate[s] or ha[s] some significant participation in the plan or scheme to make a contribution.'" (quoting FEC, *Affiliated Committees, Transfers, Prohibited Contributions, Annual Contribution Limitations and Earmarked Contributions*, 54 Fed. Reg. 34098, 34105 (Aug. 17, 1989).)  The Statement of Reasons does not announce a rule requiring more than what plaintiffs themselves set forth:  evidence that the true contributor influenced the conduit, directly or indirectly, to make a contribution in the true contributor's name.  *See id.* at 35; *O'Donnell*, 608 F.3d at 550-51 (agreeing with the government's argument that a conduit violates the prohibition on contributions in the name of another when it "act[s] at the direction and use[s] the fund of the original source").

Plaintiffs' citations to FEC regulations are inapposite.  As a preliminary point, the regulations plaintiffs cite regulate legal, disclosed conduit contributions rather than those that are illegal or disguised.  More generally, they do not contravene the Controlling Commissioners' reasoning and, in fact, reinforce it.  Plaintiffs point to 11 C.F.R. § 100.6(d)(2), which provides that, where a *conduit* "exercises any direction or control over the choice of recipient," a

37

contribution shall be reported as being "made by both the original contributor and the conduit," to contend that evidence of direction and control by the original contributor is not needed. *See id.* § 110.6(d)(2). But simply because the conduit may also exercise independent judgment does not disrupt the requirement that conduit contributions be in some way "directed through an intermediary or conduit." *See* 52 U.S.C. § 30116(a)(8). Indeed, 11 C.F.R. § 110.6(d)(1) indicates that, though a conduit relationship depends on a true contributor exercising influence over a conduit, the conduit, too, can exercise direction and control and thus be required to count the forwarded contribution against its own contribution limits. *See* 11 C.F.R. § 110.6(d)(1). And in any event, 11 C.F.R. § 110.6(c)(1)(iv)(B) specifies that conduit reports "shall contain . . . [t]he amount of each earmarked contribution, the date received by the conduit, and the intended recipient *as designated by the contributor*," further evidencing that conduits are influenced, and indeed must be influenced, by contributors in order for a conduit contribution to have occurred. *See id.* § 110.6(c)(1)(iv)(B) (emphasis added); *see also* 52 U.S.C. § 301166(a)(8) (requiring the "intermediary or conduit" to "report the original source and the intended recipient of such contribution").

In sum, nowhere does the Statement of Reasons require anything beyond what plaintiffs themselves acknowledge regarding conduit schemes: that conduit contributions are "directed through an intermediary." (Mot. at 35 (quoting 52 U.S.C. § 30116(a)(8).) Much less is there anything in the Statement of Reasons announcing that a conduit may not be an independent entity—whatever that term may mean to plaintiffs. In the absence of such a pronouncement, it follows that plaintiffs' policy concerns about such limits are unfounded. (*See* Mot. at 39-40.)

38

## CONCLUSION

The Court should grant the Commission's partial motion for summary judgment on Counts I and III and deny plaintiffs' motion.  The Commission did not act contrary to law either in the timing of the issuance of the Statement of Reasons or in the Controlling Commissioners' enunciation of the law governing the bar on conduit contributions.  As to Count I, because the Statement of Reasons was issued at nearly the same time as when the vote to close the file became effective, it therefore comports with the requirement that explanations be contemporaneous.  As to Count III, the Statement of Reasons enunciated no new standards governing conduit contributions and the explanation was not contrary to law.

Respectfully submitted,

Lisa J. Stevenson (D.C. Bar No. 457628)
Deputy General Counsel – Law
lstevenson@fec.gov

Shaina Ward (D.C. Bar No. 1002801)
Attorney
sward@fec.gov

James D. McGinley (D.C. Bar No. 1017536)
Associate General Counsel
jmcginley@fec.gov

/s/ *Sophia H. Golvach*
Sophia H. Golvach (D.C. Bar. No. 1656365)
Attorney
sgolvach@fec.gov

June 22, 2026

COUNSEL FOR DEFENDANT
FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694-1650

39