**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| REV. DAVID LEWICKI, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>Defendant. | ) | Civil Action No. 24-2505 (ABJ) |

**MEMORANDUM OPINION**

Plaintiffs Reverend David Lewicki and Vladimir Shklovsky, two voters in Georgia, brought this action against the Federal Election Commission ("FEC" or "Commission") challenging the agency's dismissal of "their administrative complaint identifying a scheme to launder approximately $5 million through dark money entities to influence the 2020 federal Senate elections in Georgia." Compl. [Dkt. # 1] ¶ 1. The FEC's Office of General Counsel reviewed the complaint and recommended that the Commission investigate the allegations. Compl. ¶ 44. But after a three-to-three deadlocked vote, the Commission dismissed the matter. Compl. ¶ 7. The Statement of Reasons for the decision, written by the three commissioners who voted to dismiss the complaint, concluded that the complaint did not give rise to a "reason to believe" a violation may have occurred. Compl. ¶ 7. Plaintiffs now bring four claims under the Administrative Procedure Act, 5 U.S.C. § 706, alleging that the agency's dismissal was arbitrary, capricious, an abuse of discretion, and contrary to law. Compl. ¶¶ 52–72. Plaintiffs seek declaratory and injunctive relief pursuant to 52 U.S.C. § 30109(a)(8)(C).

Pending before the Court is defendant's partial motion to dismiss for failure to state a claim, and the matter is fully briefed. Def's. Mot. to Dismiss [Dkt. # 5] ("Def.'s Mot."); Pls.' Opp. to Defs.' Mot. to Dismiss [Dkt. # 10] ("Pls.' Opp."); Defs.' Reply to Opp. to Mot. to Dismiss [Dkt. # 12] ("Def.'s Reply").

For the reasons stated below, defendant's partial motion to dismiss and motion for summary judgment will be **DENIED**. The parties have fully briefed their cross-motions for summary judgment,[1] and they will be addressed in a separate opinion.

**BACKGROUND**

**I. Statutory Background**

The Federal Election Campaign Act ("FECA") was passed in 1971 in an effort to "remedy any actual or perceived corruption of the political process." *FEC v. Akins*, 524 U.S. 11, 14 (1998). To that end, the Act imposes, among other things, extensive recordkeeping and disclosure requirements upon groups that fall within the definition of a "political committee." *Id.*; *see* 52 U.S.C. §§ 30101(4), 30102, 30103.

Section 30101(4)(A) defines "political committee" to include "any committee, club, association, or other group of persons which receives contributions . . . or . . . makes expenditures aggregating in excess of $1,000 during a calendar year," 52 U.S.C. § 30101(4)(A). The Supreme Court has explained that an entity must also have the "major purpose" of nominating or electing candidates in order to qualify as a political committee. *Buckley v. Valeo*, 424 U.S. 1, 79 (1976).

---

1 Pls.' Partial Mot. for Summ. J. [Dkt. # 17] ("Pls.' MSJ"); Def.'s Cross-Mot. for Partial Summ. J. & Opp. to Pls.' Mot. for Summ. J. [Dkt. ## 18, 19] ("Def.'s Cross-Mot."); Pls.' Combined Reply in Supp. of Mot. for Partial Summ. J. & Opp. to Def.'s Mot. for Partial Summ. J. [Dkt. ## 20, 21] ("Pls.' MSJ Opp. and Reply"); Def.'s Reply in Supp. of Partial Mot. for Summ. J. [Dkt. # 22] ("Def.'s MSJ Reply"); Admin. R. [Dkt. # 23-1] ("A.R.").

A group has such a "major purpose" when it spends "extensive[ly]" to influence elections, *FEC. v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986), and a group spends "extensive[ly]" when it devotes at least a majority of its annual expenditures to influence elections. *See* 72 Fed. Reg. 5595, 5605 (Feb. 7, 2007) ("The organizations' budget also evidenced its major purpose of campaign activity because 50–75% of the political budget for the organizations was intended for the Presidential election.").

When an entity meets the requirements for political committee status, it must file a statement of organization within ten days, 52 U.S.C. § 30103(a), and the committee's treasurer must begin filing periodic reports of receipts and disbursements. *Id.* § 30104. Relevant here, the reports must identify each:

> (A) person (other than a political committee) who makes a contribution to the reporting committee . . . whose contribution or contributions have an aggregate amount or value in excess of $200 within the calendar year (or election cycle, in the case of an authorized committee of a candidate for Federal office) . . . .;
>
> (B) political committee which makes a contribution to the reporting committee during the reporting period, together with the date and amount of any such contribution;
>
> (C) authorized committee which makes a transfer to the reporting committee;
>
> (D) affiliated committee which makes a transfer to the reporting committee during the reporting period and, where the reporting committee is a political party committee, each transfer of funds to the reporting committee from another political party committee, regardless of whether such committees are affiliated, together with the date and amount of such transfer; . . . .

*Id.* § 30104(b)(3)(A)–(D).

The Act also prohibits so-called "conduit contributions":

> No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no

> person shall knowingly accept a contribution made by one person in the name of another person.

*Id.* § 30122.

Finally, the Act sets out a scheme to enforce its requirements: "[a]ny person who believes a violation of [FECA] . . . has occurred[ ] may file a complaint with the Commission." *Id.* § 30109(a)(1).[2] If four of the Commission's six members vote that there is "reason to believe" that respondent violated FECA, the Commission will initiate an investigation into the violation. *Id.* § 30109(a)(2).

When the Commission deadlocks – that is, fails to garner four votes to proceed with enforcement – and then dismisses a complaint, the commissioners who voted against proceeding must issue a statement explaining their votes "[t]o facilitate judicial review." *Campaign Legal Ctr. v. FEC* ("*CLC I*"), 106 F.4th 1175, 1182–83 (D.C. Cir. 2024). A complainant may challenge the decision by filing a petition in this district within 60 days after the date of dismissal. 52 U.S.C. § 30109(a)(8)(B). The court may "declare that the dismissal of the complaint or failure to act is contrary to law." *Id.* § 30109(a)(8)(C).

## II. Factual Background

### A. Plaintiffs' Complaint to the FEC

Plaintiffs initially filed a complaint with the FEC on February 2, 2023, and filed an amended complaint on November 9, 2023. Compl. ¶ 37. The Commission numbered the matter as MUR 8110. Compl. ¶ 37. The complaint alleged a complex scheme by respondents to route "$4.9 million . . . through dark money groups to influence [the election] using a structured

---

2 Once a complaint is filed against a respondent, the FEC's Office of General Counsel "may recommend to the Commission whether or not it should find reason to believe" the respondent committed a violation of the Act. 11 C.F.R. § 111.7(a).

transaction designed to conceal the source of funds." *See* Ex. 1, MUR 8110 Amended Complaint [Dkt. #1-1] ("Am. FEC Compl.") ¶ 3.

According to the amended administrative complaint, in 2020, American Coalition for Conservative Policies ("ACCP"), a nonprofit organization, accepted $5 million from a single unidentified source. Am. FEC Compl. ¶ 4. Aside from a $60,000 contribution, that single source was "the only source of funding for ACCP that year." Am. FEC Compl. ¶ 4. Over the course of 2020, plaintiffs allege, ACCP transferred nearly all those funds to two more nonprofits: $3.1 million to Policy, Solutions, and Action for America ("PSAA"), and $1.8 million to RightOn Issues, Inc. ("RightOn Issues"). Am. FEC Compl. ¶ 4.

Within three days of receiving the money, PSAA allegedly used $1 million of the funds from ACCP to contribute to Georgia United Victory ("GUV"), a so-called Super PAC that reported expenditures in the 2020 Georgia Senate elections, and it made another contribution to GUV totaling $475,000 "shortly thereafter." Am. FEC Compl. ¶ 5. Combined, those contributions constituted "47.6% of the funds PSAA received." Am. FEC Compl. ¶ 5. In the second half of 2020, PSAA transferred $1.5 million from ACCP to RightOn Issues. Am. FEC Compl. ¶ 6.

As for RightOn Issues, over the course of three days in September 2020, it allegedly made contributions to three Super PACs that made expenditures in the 2020 Georgia Senate election: (1) $1 million to GUV, (2) $200,000 to Georgia Action Fund ("GAF"), and $120,000 to RightOn Time. Am. FEC Compl. ¶ 6. Plaintiffs alleged that RightOn Issues also spent "$2 million in 2020 on its own likely electioneering, just about the remainder of the amount received from ACCP." Am. FEC Compl. ¶ 6. After the scheme was complete, the nonprofits "fell out of use":

> ACCP reported no revenue in 2021, and only $49,697 in expenditures, most of which constituted salary for its board members. PSAA reported no revenue in 2021, $62,203 in overhead expenditures, and filed for dissolution in 2022. RightOn Issues reported no revenue in 2021 and reported it

> 'discontinued program services for nonpartisan advocacy for consumer choice in health care,' and filed for dissolution in 2022.

Am. FEC Compl. ¶ 7. In total, plaintiffs alleged that $2.795 million, or 55.9 percent, of the $5 million ACCP accepted was used to influence the Georgia Senate races. Am. FEC Compl. ¶ 8. The complaint filed with the FEC included a chart depicting the money flow:




Am. FEC Compl. ¶ 9.

The complaint named twelve individuals and entities as respondents: (1) ACCP; (2) John Fogarty, Jr., President of ACCP; (3) PSAA; (4) Christopher Marston, Treasurer of ACCP and PSAA; (5) Moses Ayala, Vice President and Secretary of PSAA; (6) RightOn Issues, Inc.; (7) Caleb Crosby, Treasurer of RightOn Issues, Inc.; (8) GUV; (9) RightOn Time; (10) Paul Kilgore, Treasurer of GUV and RightOn Time; (11) GAF; and (12) Kayla Glaze, Treasurer of GAF. *See* Am. FEC Compl. ¶¶ 38–49. Plaintiffs sued the individuals in their official and personal capacities, and they brought the action against other "Unknown Respondents" as well. Am. FEC Compl. ¶ 50.

In their complaint, plaintiffs alleged that there was "reason to believe" that respondents violated federal law in four ways. Am. FEC Compl. ¶¶ 11–24. Count One contended that the Unknown Respondents used ACCP, PSAA, and RightOn Issues as "conduits" to direct $2.795 million in contributions to three Super PACs to influence the Senate election in order to avoid disclosure under FECA, in violation of 52 U.S.C. § 30122. Am. FEC Compl. ¶¶ 11, 87–105. And, by accepting the contributions, each of the named entities and individuals also allegedly violated the conduit contribution prohibition. Am. FEC Compl. ¶¶ 87–105.

Count Two alleged in the alternative that ACCP used PSAA and RightOn Issues as conduits to direct the $2.795 million in contributions to three Super PACs so ACCP could avoid registering as a political committee and disclosing its donors, in violation of 52 U.S.C. § 30122. Am. FEC Compl. ¶¶ 106–28. By accepting the contributions, PSAA, RightOn Issues, the three Super PACs, and the individually named respondents also allegedly violated the statute. Am. FEC Compl. ¶¶ 106–28.

Count Three asserted in the alternative that PSAA either (1) used RightOn Issues as a conduit for $1.32 million in contributions to the three super PACs, and therefore PSAA, RightOn Issues, the three Super PACs, and their treasurers violated 52 U.S.C. § 30122, or (2) that PSAA's transfer to RightOn was not so unrelated to influencing elections as to excuse PSAA from reporting as a political committee, and its failure to do so violated 52 U.S.C. §§ 30102–30104. Am. FEC Compl. ¶¶ 129–55.

Finally, Count Four alleged in the alternative that ACCP qualified as a political committee due to its transfers to PSAA and RightOn Issues; all three organizations, according to plaintiffs, devoted a majority of their spending to influencing federal elections and had a major purpose to influence elections, but failed to register and report as political committees in violation of 52

U.S.C. §§ 30102–30104. Am. FEC Compl. ¶¶ 156–94. Count Four also submitted that RightOn Issues failed to report two independent expenditures in violation of 52 U.S.C. § 30104(c). Am. FEC Compl. ¶¶ 156–94.

**B. The Office of General Counsel's Report**

On May 3, 2024, the FEC Office of General Counsel issued a report on plaintiffs' complaint. *See* First General Counsel's Report ("FGCR"), MUR 8110 (Am. Coal for Conservative Policies) (May 3, 2024), *available at* https://perma.cc/8JGD-DH4L. The Report explained that the "reason to believe" finding is appropriate when a complaint "credibly alleges that a significant violation may have occurred, but further investigation is required to determine whether a violation in fact occurred and, if so, the exact scope. Accordingly, 'reason to believe' represents a 'very low evidentiary bar.'" *Id.* at 19, citing *Campaign Legal Center v. FEC*, 646 F. Supp. 3d 57, 67 (D.D.C. Dec. 8, 2022).

The Report found that Count One of the complaint met the "reason to believe" threshold:

> Because the record indicate[d] that ACCP, PSAA, and RightOn Issues may have been conduits through which Unknown Respondent(s) contributed 2.795 million to the three super PACs, [OGC] recommends that the Commission find reason to believe that Unknown Respondent(s) made, and that PSAA and RightOn Issues knowingly permitted their names to be used to effect, contributions in the name of another person in violation of 52 U.S.C. § 30122 and 11 C.F.R. § 110.4(b).

*Id.* at 4–5. In making the recommendation, OGC noted that, at the reason to believe stage, the Commission has typically considered the presence of certain information as indicative of a possible conduit contribution scheme, such as:

> (1) a short timespan between an entity's formation and the contribution(s) in question; (2) a short timespan between an entity's receipt of funds and the contribution(s) in question; (3) lack of activity preceding the contribution in question; (4) the size of the contribution(s) in question relative to other spending; (5) the degree of overlap between the amount of

> funds received versus the amount subsequently contributed; and (6) an entity's lack of online presence.

*Id.* at 20–22 (citations omitted).

The Report noted that PSAA's receipt of funds from ACCP and subsequent contributions to GUV reflected "numerous circumstances analogous to those the Commission has previously recognized as indicating a possible conduit contribution scheme." *Id.* at 22. It also observed that the "structure of [PSAA's] transactions at issue appear[ed] to avoid the Act's disclosure requirements," and had it directly contributed all the funds to GUV rather than routing it through RightOn Issues, "the proportion of PSAA's spending on federal campaign activity would have constituted a majority of its spending, increasing the chances of being deemed a political committee under the Act." *Id.* at 24 (citation omitted). Moreover, according to the Office of General Counsel, PSAA's "lack of activity *after* its contributions to [GUV] and RightOn Issues, and its dissolution in 2022, suggests it may have been" a conduit. *Id.* (emphasis in original) (citation omitted). Finally, PSAA filled out IRS Form 1024-A, which asks applicants whether they have spent or plan to spend money attempting to influence elections, and PSAA "did not disclose that it had already received $3.1 million from ACCP and had already contributed at least $1.475 million to [GUV] more than a month before" it filed the form. *Id.* at 25 (citation omitted).

The OGC Report also listed the indicia it relied upon in finding reason to believe that RightOn Issues was part of a conduit contribution scheme, *id.* at 27, and it detailed why it found reason to believe ACCP was also a conduit in the alleged scheme. *Id.* at 30.

The General Counsel did recommend, though, that the Commission take "no action" on several of plaintiffs' claims:

> The [OGC] recommend[s] that the Commission take no action at this time with respect to ACCP because, while it appears to have been a conduit through which Unknown Respondent(s) made a contribution in the name of

> another, it did not itself make or permit its name to be used to effect a contribution in the name of another. Because there is insufficient information in the record at this time as to the knowledge of the three super PACs, we recommend that the Commission take no action at this time with respect to the allegation that [GUV] and Paul Kilgore in his official capacity as treasurer, [GAF] and Kayla Glaze in her official capacity as treasurer, and RightOn Time and Paul Kilgore in his official capacity as treasurer violated [FECA] by knowingly accepting a contribution in the name of another person and failing to report the contribution's true source. We also recommend that the Commission take no action with respect to the allegations that the super PAC treasurers, Paul Kilgore and Kayla Glaze, violated [FECA] in their personal capacities in connection with the super PAC's acceptance of contributions from PSAA and RightOn Issues.
>
> Because a 'person' can either be the true source of a contribution or a conduit that transmits the funds of another — but not both — we recommend that the Commission take no action at this time with respect to the Complaint's allegations that ACCP, PSAA, and RightOn Issues failed to register and report as political committees in violation of [FECA]. For the same reason, we recommend that the Commission take no action at this time against Fogarty, Crosby, Marston, and Ayala with respect to the alleged failure of ACCP, PSAA, and RightOn Issues to register and report as political committees.

*Id.* at 5. Finally, the Report recommended that the Commission dismiss the allegation that RightOn Issues failed to file an independent expenditure report because the alleged conduct failed to meet the definition of an "independent expenditure" and did not trigger reporting requirements. *Id.* at 5–6.

The OGC Report closed by acknowledging the "prudential considerations" involved in whether to investigate the complaint. *Id.* at 41. It noted that "there are compelling reasons *not* to dismiss this matter," and that "[v]iolations of [FECA's] prohibition on [conduit contributions] are among the most serious within the Commission's jurisdiction." *Id.* at 42 (emphasis in original).

### C. The FEC's Decision and Statement of Reasons

On June 25, 2024, the Commission divided three-to-three on the OGC's recommendations and failed to reach the four-vote threshold necessary to accept the recommendations or dismiss the

complaint. *See* Certification, MUR 8110 (Am. Coal. For Conservative Policies) (July 2, 2024), *available at* https://perma.cc/ZJ2U-NEC7. On July 1, 2024, FEC Chairman Sean Cooksey then moved for the Commission to close the file 30 days after the certified vote, which the Commission approved unanimously on July 3, 2024. Certification, MUR 8110 (Am. Coal. for Conservative Policies) (July 3, 2024), available at https://perma.cc/9AR3-8DVY.

On July 29, 2024, the three commissioners who voted against proceeding with an enforcement action – Commissioners Cooksey, Dickerson, and Trainor – issued a Statement of Reasons to explain the FEC's decision to dismiss the complaint. *See* Statement of Reasons of Chairman Sean J. Cooksey and Commissioners Allen J. Dickerson and James E. "Trey" Trainor, III, MUR 8110 (Am. Coal. for Conservative Policies) (July 29, 2024) ("SOR"), available at https://perma.cc/5DCZ-TDRG. Among other things, the Statement of Reasons took issue with OGC's articulation of the reason to believe standard:

> The Commission will find reason-to-believe when a complaint (1) fairly invokes its jurisdiction, (2) is credible, and not merely a bare accusation of wrongdoing, (3) the response has not sufficiently answered the complaint, and (4) it determines that enforcement is a judicious use of the Commission's scarce resources. This is not a loose standard, and '[w]e are forbidden' from merely providing a 'rubber stamp' to a complaint's allegations, or 'proceed[ing] on an 'RTB-of-the-gaps' approach to law enforcement.'
>
> In urging us to find RTB, however, the Office of General Counsel ('OGC') did not apply that standard of review. Rather, OGC posited that reason-to-believe is a 'very low evidentiary bar' which may be cleared by mere speculation. OGC is mistaken.
>
> * * *
>
> In short . . . the Commission will only find RTB when the complaint credibly alleges a violation, and that the Commission is forbidden from finding RTB on the basis of assertion, insinuation, speculation, or conjecture.

*Id.* at 2–3 (internal citations and quotation marks omitted).

The problem with the complaint, according to the three Commissioners who voted against it, was that it was unknown when ACCP or PSAA made their contributions totaling $3.3 million to RightOn Issues; therefore, they reasoned, there was no evidence indicating that RightOn Issues received the funds before it made its contributions to the three Super PACs, since RightOn Issues raised $5.6 million in total in 2020. *Id.* at 6.

The Statement of Reasons also noted that RightOn Issues "received more than two million dollars in completely unrelated contributions from third parties" and "devote[d] $2.127 million, more than 40% of the total, to 'amorphous likely engineering,' which suggested that it was not being used as a conduit. *Id.* at 6–7. Moreover, it pointed out that RightOn Issues was also the only source of contributions to GAF and RightOn Time. It questioned why "an unknown 'true contributor'" would make the contributions "through a clearly-independent entity (RightOn Issues)." *Id.* at 7. Finally, the Statement of Reasons credited the Respondents' denials, "which are categorical, albeit imprecise." *Id.* Plaintiffs filed a timely challenge to the Commission's dismissal. *See* Compl.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79, citing *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler*, 617 F.2d at 608. Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997). Here, both the OGC recommendation and the Statement of Reasons were incorporated by reference in the complaint. *See* Compl. ¶¶ 8, 44.

**ANALYSIS**

The motion to dismiss is directed only at Count II, which alleges that the Commission's dismissal was contrary to law because the Statement of Reasons relied on an impermissible interpretation of the reason to believe standard when it imposed a "heightened evidentiary bar that conflicts with controlling precedent." Compl. ¶¶ 59. The FEC contends that this count fails to state a claim because "the controlling Commissioners' assessment of the reason to believe standard is inseparable from their analysis of the underlying facts and substantive law at issue." Def.'s Mot. at 1. The application of a legal standard to the facts, defendant argues, is the "sole basis on which the Court may determine whether the Commissioners acted 'contrary to law.'" *Id.* But defendant offers no case law to support that proposition. Instead, the FEC points to the language of 52 U.S.C. § 30109(a)(8)(C) as support for its contention that the "government's articulation of an abstract legal standard should not be the basis for a finding that the government acted contrary to law[.]" Def.'s Mot. at 11; *see also* Def.'s Reply at 4.

Section 30109(a)(8)(C) provides that courts in this district "may declare that [a] dismissal of [a] complaint or the failure to act is contrary to law." And the D.C. Circuit has explained that the Commission's determination is "contrary to law" if the Commission "relied on 'an impermissible interpretation of the Act,' *or* if the dismissal was otherwise 'arbitrary or capricious, or an abuse of discretion.'" *Campaign Legal Ctr. v. FEC* ("*CLC II*"), 89 F.4th 936, 938 (D.C. Cir. 2024) (emphasis added), citing *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986). In Count II, plaintiffs specifically allege that the Statement of Reasons falls within the first category. *See* Compl. ¶ 62 ("Because the dismissal, as justified by the [Statement of Reasons], rests on an 'impermissible interpretation of law,' the dismissal was contrary to law."), *citing Orloski*, 795 F.2d at 161.

The term "reason to believe" comes directly from the text of FECA, 52 U.S.C. § 30109(a)(2), and the Statement of Reasons clearly articulates how the Commission thought that term should be interpreted. *See* SOR at 2 ("[Reason to believe is] not a loose standard, and we are forbidden from merely providing a rubber stamp to a complaint's allegations, or proceeding on an RTB-of-the-gaps approach to law enforcement.") (internal quotation marks omitted). Since Count II challenges that interpretation, the Court is compelled by binding Circuit authority to find that Count II states a plausible claim that the Statement of Reasons was contrary to law. That claim does not merge with the counts alleging that the decision described in the Statement of Reasons was arbitrary and capricious in applying the reason to believe standard; it alleges that the standard applied was incorrect as a matter of law.

Other Courts have previously pointed to legal propositions advanced in a Statement of Reasons to conclude that the FEC's explanation for a dismissal was contrary to law. In *CLC I*, for instance, the Court of Appeals held that a "bright-line rule" in a Statement of Reasons that exempted all money spent to produce an internet communication was contrary to FECA's expansive definition of "expenditures" under 52 U.S.C. § 30101(9)(A)(i). 106 F.4th at 1191. And in *Citizens for Responsibility and Ethics in Washington v. Federal Election Commission*, 209 F. Supp. 3d 77, 92 (D.D.C. 2016), the district court held that the Commission's dismissal was contrary to law when its reasoning was contrary to "the weight of the [] precedent." So too can the Court evaluate the Commission's articulation of the reason to believe standard – which comprises four of the SOR's eight pages – and determine whether it is more stringent than the statute requires, or whether it contravenes existing precedent.

Contrary to defendant's assertions, a court's finding that the Commission applied an impermissible interpretation of a standard would not lead to "absurd results" such that courts could

second-guess the Commission's enforcement actions "despite a faultless analysis of the campaign finance law purportedly violated and the application of law to the facts." Def.'s Mot. at 12. First, the Court does not agree that an application of law to the facts would be "faultless" if it is grounded upon an incorrect interpretation of the "reason to believe" standard or any other statutory term. Second, even if the matter is ultimately remanded to the Commission and, upon application of the appropriate standard, defendant reaches the same conclusion, such a result would not be "absurd." The purpose of explanations for agency action is to "promote 'agency accountability' by ensuring that parties and the public can respond fully and in a timely manner to an agency's exercise of authority." *End Citizens United Pac v. Fed. Election Comm'n*, 69 F.4th 916, 922 (D.C. Cir. 2023), quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 22 (2020). The public's ability to respond fully to an agency's decision is better served when those decisions do not rest on impermissible interpretations of the law.

**CONCLUSION**

To be clear, nothing in this opinion should be construed as a determination of whether the Commission's articulation of the reason to believe standard was contrary to law. The motion only challenges the Court's authority to evaluate the standard at all. Since *Orloski* and its progeny are clear that the Court may review the Commission's explanation and determine whether it relies on an "impermissible interpretation" of FECA, 795 F.2d at 161, the Court finds that Count II falls squarely within that authority. For those reasons, defendant's partial motion to dismiss Count II is **DENIED**.

AMY BERMAN JACKSON
United States District Judge

DATE: September 30, 2026